## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: ) | |
| ) | Chapter 7 |
| FIRST KNOWLEDGE PARTNERS, INC. ) | Case No. 02-16649 CJK |
| ) | |
| Debtor. ) | |
| ) | |
| ) | |
| JOHN J. AQUINO, TRUSTEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| AMADEUS CAPITAL CORPORATION, ) | |
| AMADEUS CAPITAL U.S. INC., ) | |
| MILES S. NADAL, ROBERT BALFOUR, ) | |
| GAVIN SWARTZMAN, TREVOR ) | Adversary Proceeding |
| MAUNDER, DAVID G. ROBINSON, ) | No. 04-01288-JNF |
| JAMES D. FISHER, DESZO HORVATH, ) | |
| DAVID C. KASSIE, DEAN C. KEHLER, ) | |
| ALLAN Z. LOREN, STEPHEN M. PUSTIL, ) | Civil Action |
| THOMAS VOLPE, DEREK SMITH ) | No. 05-cv-10529-FDS |
| and MICHAEL SIMONETTA, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |

## DEFENDANT DAVID G. ROBINSON'S MOTION FOR LEAVE
## TO FILE REPLY TO TRUSTEE'S OPPOSITION TO HIS MOTION FOR
## WITHDRAWAL OF THE REFERENCE

Defendant David G. Robinson ("Robinson") hereby requests that the District Court grant

him leave to file a Reply to plaintiff Trustee's Opposition to his Motion for Withdrawal of the

Reference.

As grounds for his Reply, Robinson states as follows:

1.      On February 15, 2005, Robinson filed a Motion for Withdrawal of Reference to the Bankruptcy Court (the "Withdrawal Motion").

2.      On March 4, 2005, the Trustee filed an opposition to the Withdrawal Motion (the "Opposition").

3.      The Trustee's Opposition raises several new issues of fact and law which Robinson has not yet addressed.

4.      Robinson seeks leave to file a Reply in the form attached hereto as Exhibit A, so that he has a fair opportunity to address the new issues of fact and law raised in the Opposition, as well as the opportunity to clarify other issues relating to the arguments raised in the Opposition.

5.      Robinson believes that his Reply will be of assistance to the Court in reaching a fair and prompt determination of the issues in the Withdrawal Motion; and, that good cause exists for the Court to permit him to file his Reply.

6.      In preparing this Motion, counsel for Robinson has conferred with counsel for the Trustee in accordance with the District Court's Local Rule 7.1(A)(2). A certificate to this effect is attached hereto as Exhibit B.

## CONCLUSION

For all of the foregoing reasons, Robinson respectfully requests that this Court grant

leave to file a reply memorandum of points and authorities in response to Trustee's Opposition.

Respectfully submitted
for the defendant,
David G. Robinson
by his attorney:

Theodore E. Dinsmoor (BBO #125540)
Burns & Levinson LLP
125 Summer St.
Boston, MA  02110
(617) 345-3000
(617) 345-3299 facsimile

Dated:  April 7, 2005

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: ) | |
| ) | Chapter 7 |
| FIRST KNOWLEDGE PARTNERS, INC. ) | Case No. 02-16649 CJK |
| ) | |
| Debtor. ) | |
| ) | |
| ) | |
| JOHN J. AQUINO, TRUSTEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| AMADEUS CAPITAL CORPORATION, ) | |
| AMADEUS CAPITAL U.S. INC., ) | |
| MILES S. NADAL, ROBERT BALFOUR, ) | |
| GAVIN SWARTZMAN, TREVOR ) | Adversary Proceeding |
| MAUNDER, DAVID G. ROBINSON, ) | No. 04-01288-JNF |
| JAMES D. FISHER, DESZO HORVATH, ) | |
| DAVID C. KASSIE, DEAN C. KEHLER, ) | |
| ALLAN Z. LOREN, STEPHEN M. PUSTIL, ) | Civil Action |
| THOMAS VOLPE, DEREK SMITH ) | No. 05-cv-10529-FDS |
| and MICHAEL SIMONETTA, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANT DAVID G. ROBINSON'S REPLY TO PLAINTIFF'S
## OPPOSITION TO HIS MOTION FOR WITHDRAWAL OF THE REFERENCE

Defendant David G. Robinson ("Robinson") hereby submits this Reply to the Plaintiff's

Opposition to his Motion for Withdrawal of the Reference to the Bankruptcy Court. The essence

of Robinson's Reply is that the Opposition of plaintiff, John J. Aquino, Trustee (the "Trustee"),

contains misleading assertions of fact and misstatements of law.

## I. REPLY TO TRUSTEE'S SUMMARY OF FACTS

As indicated by the Trustee's Summary of Facts in his Opposition, the gravamen of the

Trustee's Adversary Complaint against Robinson and the other First Knowledge Partners, Inc.

("FKP") directors and officers is a pre-petition non-core state law tort claim that they breached

their fiduciary duties to FKP by: a) paying "excessive" fees to defendants Amadeus Capital

Corporation and/or its subsidiary Amadeus Capital U.S. Inc. (collectively "Amadeus"); b)

making "exorbitant" cash payments to Amadeus; and, c) paying "unreasonable" compensation to

themselves. Out of his pre-petition non-core state law tort claim for breach of fiduciary duty, the

Trustee then fashions supplemental core claims for fraudulent transfer and preferential transfer,

all of which arise out of the same acts, transactions and events as the breach of fiduciary duty

claim.

Also, the Trustee has asserted a pre-petition non-core state law breach of contract claim

(mischaracterized as a turnover claim) against Robinson with regard to payment of a note, which

was integral to his employment as Chief Executive Officer ("CEO") for FKP. Specifically,

Robinson's Employment Contract (attached as Appendix A) provided that Robinson should

purchase $250,000 of FKP shares from the management pool at a price of $3.92 per share; and,

that he should borrow a minimum of $250,000 from FKP to purchase such shares. Pursuant to

the Employment Contract, Robinson did borrow $250,000 from FKP in exchange for a Note

(attached as Appendix B) so he could purchase $250,000 of FKP shares under the terms of a

Stock Pledge Agreement (attached hereto as Appendix C). Thus, the Employment Contract, the

Note and the Stock Pledge Agreement constitute an integrated transaction. Further, in the event

that the Trustee were successful in voiding Robinson's Employment Contract for unreasonable

compensation, then, Robinson would have a claim against FKP in *quantum meruit*, because, in the absence of a contract: a) he provided valuable services with the expectation of compensation; b) compensation measured by the fair value of Robinson's services is just; and, c) FKP benefited from Robinson's services. Thus, in response to the Trustee's claims, Robinson filed counterclaims, which arise <u>post petition</u> out of the <u>integrated transaction</u> involving his <u>employment</u>.

Therefore, as a practical matter, all the Trustee's claims and Robinson's counterclaims arise out of a common nucleus of acts, <u>transactions</u> and events involving FKP's <u>employment of Robinson as CEO</u>; <u>Robinson's</u> <u>performance as his duties and responsibilities as CEO</u>; and, <u>Robinson's right to</u> <u>compensation and</u> <u>indemnity as CEO</u>. Pursuant to Fed. R. Civ. P. 13, as well as Fed. R. Bankr. P. 7013, all such counterclaims are <u>compulsory</u>; so they must be adjudicated at the same time in the same forum to avoid a waste of judicial resources and the potential for inconsistent findings, rulings and judgments.

## II. <u>REPLY TO TRUSTEE'S PROCEDURAL HISTORY</u>

Although the Trustee did file his Adversary Complaint on or about September 14, 2004, most defendants did not file their Answers until December 1, 2004; Robinson did not file his Answer until December 15, 2004; and, defendants Kassie and Kehler did not file their Answers until December 3, 2004.

Also, the Trustee did not file his Answer to Robinson's counterclaims until January 4, 2005; and the other defendants did not file their Answers to Robinson's cross-claims until February 11, 2005. Thus, the issues in this Adversary Proceeding were <u>not joined</u> until at least February 11, 2005.

Further, rather than answer the Adversary Complaint, several defendants filed Motions to Dismiss for lack of personal jurisdiction; and, these motions, were briefed. However, the Bankruptcy Court has stayed these Motions pending the District Court's ruling on the pending motion to withdraw the reference.

And further, on January 4, 2005, the parties did negotiate and file a Joint Stipulation to Propose Pretrial Schedule, but the Bankruptcy Court has also stayed the pretrial conference, pending the District Court's ruling on the pending motions to withdraw the reference.

Finally, on March 23, 2005, Bankruptcy Judge Robert Somma recused himself from the Adversary Proceeding; and, pursuant to such recusal, the Proceeding was transferred to Bankruptcy Judge Joan N. Feeney. As yet, Judge Feeney has not conducted any hearings in this Adversary Proceeding.

Thus, contrary to the Trustee's efforts to characterize this Adversary Proceeding as a mature Proceeding, procedurally the Proceeding is still in its incipiency and there has been no material action by the Bankruptcy Court whatsoever.

### III. REPLY TO THE TRUSTEE'S ARGUMENTS

**A.      JUDICIAL EFFICIENCY REQUIRES WITHDRAWAL OF THE REFERENCE, BECAUSE ROBINSON HAS A RIGHT TO A JURY TRIAL AND HE HAS NOT CONSENTED TO JURISDICTION IN THE BANKRUPTCY COURT**

Article III, Section One, of the United States Constitution provides that the "judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish" and that the "Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behavior, and shall , at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."

It is well established that while District Courts are Article III courts, Bankruptcy Courts are not. See *In re Parkland/Atlanta Joint Venture*, 927 F.2d 532, 538 (11th Cir. 1991) ("bankruptcy courts are not Article III courts and therefore may not exercise the judicial power of the United States"). Consequently, in *Northern Pipeline Constr. Co. v. Marathon Pipeline Co.,* 458 U.S. 50 (1982), a plurality of the United States Supreme Court concluded that the portion of the Bankruptcy Reform Act of 1978 conferring Bankruptcy Courts with jurisdiction over all cases arising under or related to the bankruptcy code was unconstitutional.

In response to the *Northern Pipeline* decision, Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984, which amended the Bankruptcy Act of 1978 by vesting original jurisdiction over bankruptcy cases and proceedings in the District Courts. See 28 U.S.C. § 1334(a). Bankruptcy Courts now obtain jurisdiction over cases and proceedings under the Bankruptcy Code, only by referral at the discretion of the District Courts. See 28 U.S.C. 157(a). This statutory scheme ensures that "the judicial power of the United States will be ultimately exercised by an Article III Court." *In re Parklane/Atlanta Joint Venture*, 927 F.2d 532, at 538.

Because the jurisdiction of a Bankruptcy Court is obtained only by referral, a District Court may, for cause, withdraw the reference of a case or proceeding in bankruptcy under 28 U.S.C. § 157(d), which provides, in pertinent part:

> The district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown (emphasis added).

Although Congress has not provided a statutory definition of the word "cause," the District Courts usually consider two factors: (1) whether the claims made in the adversary

proceeding are core or non-core; and, (2) whether a party is entitled to a jury trial pursuant to the Seventh Amendment of the United States Constitution on any of the clams asserted.

In order to avoid the constitutional problems discussed by the Supreme Court in *Northern Pipeline,* Congress created the distinction between core and non-core bankruptcy proceedings. If a proceeding is core, it may be tried in the Bankruptcy Court and then reviewed by the District Court under traditional standards for appellate review. Conversely, if a proceeding is non-core, then the bankruptcy court is only permitted to make proposed findings of facts and conclusions of law, which the District Court reviews *de novo.*

However, whether core or non-core, <u>when the right to a jury trial is asserted and the party does not consent to trial in the Bankruptcy Court,</u> the adversary proceeding must then be tried in the District Court, because the Bankruptcy Court lacks the authority to issue final orders or judgments. See, e.g., *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures, Corp.),* 4 F.3d 1095, 1101 (2nd Cir. 1993) (holding that the Seventh Amendment to the Constitution "prohibits bankruptcy courts from holding jury trials in non-core maters"); *Beard v. Braunstein,* 914 F.2d 434, 443 (3rd Cir. 1990) ("By the Seventh Amendment, any fact found by a jury cannot be reviewed de novo. Accordingly, a bankruptcy court cannot conduct a jury trial in a non-core proceeding"); *Taxel v. Electronic Sorts research (In re Cinematronics, Inc.),* 916 F.2d 1444, 1451 (9th Cir. 1990) (finding that "grave Seventh Amendment problems would arise if a jury trial is conducted by the bankruptcy court [since] section 157(c)(1) requires de novo review by the district court of non-core matters"); *Ellenberg v. Bouldin (In re Bouldin),* 125 B.R. 851, 855 (N.D. Ga. 1990) ("the Seventh Amendment would be violated where a district court reviews de novo the verdict of a jury trial conduct by a bankruptcy court in a non-core proceeding"); *Naturally Beautiful Nails, Inc. v. Wal-Mart Stores, Inc. (In re Naturally Beautiful Nails, Inc.),*

225 B.R. 574, 576 (Bankr. M.D. Fla. 2000) ("the Constitution prohibits trial by jury in a non-core or related matters"); *Haile Co. v. R.J. Reynolds Tobacco Co. (In re Haile Co.),* 132 B.R. 979 (Bankr. S.D. Ga. 1991) ("The Seventh Amendment's prohibition against a de novo review of the jury's findings and § 157(c)(1)'s requirement that the bankruptcy court's findings in non-core proceedings be reviewed de novo by the district court are incompatible). Accordingly, because Robinson does not consent to the Bankruptcy Court's jurisdiction, the Bankruptcy Court cannot conduct a jury trial in this Adversary Proceeding.

Here, as the Trustee does not dispute Robinson's right to a jury trial on either the state law tort claim for breach of fiduciary duty or the supplemental claims arising out of the same acts, transactions or events, judicial efficiency and economy is best served by the conduct of pretrial, trial and post-trial procedure before the District Court.

First, the Bankruptcy Court has no special knowledge or expertise in this Adversary Proceeding. Second, any bifurcation of pretrial and trial activities would deprive the District Court of involvement in matters which would educate the Court on the particulars of the Proceeding and thereby facilitate its ability to conduct an efficient and economical trial. Third, as this Adversary Proceeding strays beyond the bounds of the bankruptcy law embodied in Title 11 into the realm of corporate management, leveraged finance and director and office fiduciary duty, the prospect for over taxing everyone's resources in trying to educate two separate courts in the factual and legal intricacies of the Proceeding is enormous and ought to be avoided, particularly when withdrawal of the reference can occur <u>before</u> the Bankruptcy Court has invested any time and effort in the Proceeding.

In sum, Robinson's Motion to Withdraw the Reference is very timely; and, only by acting favorably on the Motion at this stage of the Proceeding can this Court avoid the waste of judicial efficiency and energy that the Trustee purportedly abhors.

**B.    ROBINSON'S ASSERTION OF COUNTERCLAIMS DOES NOT WAIVE HIS RIGHT TO A JURY TRIAL, BECAUSE THE COUNTERCLAIMS ARE COMPULSORY**

Contrary to the Trustee's assertions, the Supreme Court has never held that the filing of a counterclaim in the Bankruptcy Court waives a party's right to a jury trial. Rather, a close reading of *Langerkamp v. Culp*, 498 U.S. 42, 44 (1990); *Granfinanciera S.A. v. Nordberg*, 492 U.S. 33,58-59 (1989); and, *Katchen v. Landry*, 382 U.S. 323, 336 (1966), shows that in all three opinions the Superior Court was referring to the <u>voluntary</u> filing of a <u>proof of claim</u> in the Bankruptcy Court: <u>not</u> the <u>involuntary</u> filing of a <u>compulsory</u> <u>counterclaim</u> that was precipitated by the Trustee's filing of an Adversary Complaint. In this regard, the U.S. District Court in *McCord v. Papantonioci*, 316 B.R. 113, 124, n. 15 (E.D.N.Y. 2004), also misread the Supreme Court opinions and thereby confused the words <u>proof of claim</u> with the word <u>counterclaim</u>.

Certainly, there is a vast difference between the <u>voluntary</u> filing of a <u>proof of claim</u> and the <u>involuntary</u> filing of a <u>compulsory counterclaim</u>, as Collier has noted in his treatise, Collier on Bankruptcy, ¶ 3.08[2][ii], where he said:

> Filing a proof of claim is a voluntary act; if the claimant wishes to forgo a dividend in order to preserve jury trial rights, the claimant can do so. If the claimant wishes to receive a dividend and knowingly waive a jury by filing a proof of claim, that is the claimant's choice. Not so the party faced with defending a suit brought by a trustee. There, forc[ing] the defendant to make a choice – give up any counterclaims and perhaps suffer a larger-than-warranted judgment, or defend to the utmost and waive a jury . . . [would be] unfair.

At the outset, it is important to note that the term "waiver" is defined as "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). Also, it is important to note that "As the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver." *Aetna Ins. Co. v. Kennedy*, 301 U.S. 389, 393 (1937). See also, *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959) (wherever possible, the constitutional right to a jury trial must be preserved); and, *NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 912-13 (D. Del. 1996) ("courts should not be eager to embrace an implied waiver of constitutional rights where there is an affirmative and timely assertion of those rights").

Here, Robinson <u>did not</u> intentionally relinquish his constitutional right to a jury trial. See Robinson's Responsive Pleading (attached as Appendix D), <u>objecting</u> to the Bankruptcy Court's jurisdiction; and, <u>demanding</u> a jury trial. Therefore, the pertinent issue is whether Robinson's filing of compulsory counterclaims should be deemed a waiver by <u>operation of law</u>.

A number of courts have concluded that a defendant's counterclaims should <u>not</u> be deemed a waiver of his Seventh Amendment right to a jury trial, unless the defendant's submission clearly evidences a <u>voluntary</u> and <u>intentional</u> relinquishment of that right. See, e.g., *Beard v. Brownstein*, 914 F.2d 434, 442 (3d Cir. 1990) (holding that tenant's compulsory counterclaim seeking relief for damages caused by poor condition of rental property, filed in response to an adversary complaint brought to collect unpaid rent, should not effect a waiver of a right to a jury trial, <u>because filing a compulsory counterclaim was involuntary</u>); *NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.)*, 203 B.R. 905, 913 (D. Del. 1996) (holding that counterclaim for breach of contract and negligent misrepresentation filed in response to an adversary complaint alleging breach of contract did not constitute a waiver, because it "would not serve

justice to find that even though a party has affirmatively and timely asserted its Seventh

Amendment right to a trial by jury, it nevertheless implicitly waived that right by bringing

compulsory counterclaims that arose out of the same occurrence or transaction as the claims

asserted against it"). Cf *RMD Sports Group, Inc. v. Equitex, Inc. (In re RMD Sports Group,*

*Inc.),* 260 B.R. 915, 924-25 (Bankr. N.D. Ga. 201) (refusing to extend waiver principles

articulated by the Supreme Court in *Langenkamp* and *Granfinanciera* to adversary complaint

alleging common law claims for breach of fiduciary duty, legal malpractice, negligence, and civil

conspiracy, because right to a jury trial on common law claims is constitutionally protected).

Here, in accordance with Fed. R. Bank. P. 7008, Robinson's Responsive Pleading

(attached as Appendix D) <u>objected</u> to the Bankruptcy Court's entry of final orders and judgment;

and, he affirmatively and timely <u>demanded</u> his Seventh Amendment right to a jury trial. This

demand weighs against a finding of waiver in light of the Supreme Court's indication that a

waiver is ordinarily an intentional relinquishment of a known right or privilege. *Johnson v.*

*Zerbst*, 304 U.S. 458, 464 (1938); and, "because the right to a jury is fundamental, courts must

indulge every reasonable presumption against waiver." *Burns v. Lawther*, 53 F.3d 1237, 1240

(11th Cir. 1995). "The right to a jury trial 'shall be preserved . . . inviolate', and a court's

discretion 'is very narrowly limited and must, whenever possible be exercised to preserve jury

trial.'" *Borgh v. Gentry*, 953 F.2d 1309, 1311 (11th Cir. 1992).

Moreover, Robinson's counterclaim was compulsory in nature and therefore, not at all

indicative of Robinson's voluntary submission to the jurisdiction of the Bankruptcy Court. See

*Beard v. Brownstein*, 914 F.2d 434, 442 (3d Cir. 1990) (holding that implying a waiver of the

Seventh Amendment right to trial by jury where a defendant files a compulsory counterclaim in

response to an adversary proceeding is something less than fair play). Indeed, if Robinson failed

to assert such compulsory counterclaims in this Adversary Proceeding, he would later be barred
from bringing the counterclaims. See *Nippon Credit Bank, Ltd. V. Matthews,* 291 F.3d 738, 755
(11th Cir. 2002) ("Compulsory counterclaims which are not brought are 'thereafter barred'").
For this reason it would not serve justice to find that even though Robinson affirmatively
asserted his Seventh Amendment right to a trial by jury, he nevertheless implicitly waived that
right by bringing counterclaims that arose out of the same transaction as the Trustee's claims
asserted against him. *NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.),* 203 B.R. 905, 913 (D.
Del. 1996).

Fed. R. Civ. P. 13(a), which governs counterclaims filed in federal court, provides, in
relevant part:

> A pleading shall state as a counterclaim any claim which at the
> time of servicing the pleading, the pleader has against any
> opposing party, if it arises out of the <u>transaction</u> or occurrence that
> is the subject matter of the opposing party's claim and does not
> require for its adjudication the presence of third parties or whom
> the court cannot acquire jurisdiction. (emphasis added).

"For the purposes of Rule 13(a), <u>transaction</u> is a word of flexible meaning,"
encompassing "a series of many occurrences, depending not so much upon the immediateness of
their connection as upon their logical relationship." *Alexander v. Fulton County*, 207 F.2d 1303,
1323 (11th Cir. 2000) (emphasis added). "Accordingly, <u>all logically related events</u> entitling a
person to institute a legal action against another generally are regarded as comprising a
<u>transaction</u> or occurrence." *Id.* (emphasis added). In the context of compulsory counterclaims,
a transaction "may comprehend a series of many occurrences, depending not so much upon the
immediateness of their connection as upon their <u>logical relationship</u>." " *Moore v. New York
Cotton Exch.,* 270 U.S. 593, 610 (1926) (emphasis added).

Applying the aforementioned standards to this Adversary Proceeding, Robinson's counterclaims arise out of the same <u>integrated transaction</u> as the Trustee's claims. Specifically, Robinson's Employment Contract and his Note for FKP shares constitute an integrated transaction, such that the Trustee's claim upon the Note compels Robinson to file any counterclaims he has upon the Employment Contract; and, in the event such Employment Contract is voidable, upon a claim for *quantum meruit* for the fair and reasonable value of his services. *Technicorp International II, Inc. v. Johnston*, 1997 Del. Ct. Lexis 126 (August 22, 1997) (holding that if directors and officers are required to return to the corporation excessive compensation, they are then entitled to recover the reasonable value of their services in quantum meruit). Thus, under Fed. R. Civ. P. 13(a), Robinson's counterclaims are compulsory.

Notwithstanding Rule 13(a), Fed. R. Bankr. P. 7013 says that:

> Rule 13 F.R. Civ. P. applies in adversary proceedings, except that a party sued by a trustee or debtor in possession <u>need not</u> state as a counterclaim any claim that the party has against the debtor, the debtor's property, or the estate, unless the claim arose after the entry of an order for relief (emphasis added).

Here, it is important to note that Robinson's compulsory counterclaims arose <u>post-petition</u>. However, even if Robinson's compulsory counterclaims arose <u>pre-petition</u>, the filing of such counterclaims would not waive his right to a jury trial, because, by statute, the Bankruptcy Rules "shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2075. Certainly, the right to trial by jury is a <u>substantive right</u>. Thus, Bankruptcy Rule 7013 cannot be interpreted to divest Robinson of his Seventh Amendment right to a jury trial by making his counterclaims permissive, rather than compulsory. See *Data Compass Corp. v. Datafast, Inc. (In re Data Compass Corp.)*, 92 Bankr. 575, 578 (Bankr. E.D.N.Y. 1988).

Rather, as the Delaware Court said in *In re NDEP Corporation,* 203 B.R. 905 (D. Del. 1996), Rule 7013 only provides that a party "need not" bring a prepetition counterclaim that would ordinarily be considered compulsory under Fed. R. Civ. P. 13(a), when the party is sued by a debtor or trustee. Simply put, Rule 7013 does not prohibit a party from bringing counterclaims; nor, does it say that bringing counterclaims will result in the waiver of a party's Seventh Amendment right to a trial by jury. Thus, Rule 7013, properly interpreted, recognizes that: a) a party may elect to file a proof of claim against the debtor; or, b) in the alternative, to preserve his right to a jury trial, a party may forego a proof of claim and elect to file counterclaims against the debtor. Accordingly, the Delaware Court held that a party who is sued by a debtor in an adversary proceeding does not waive his right to a jury trial or his right to object to jurisdiction, when he brings compulsory counterclaims under Rule 13, even though Rule 7013 may deem such compulsory counterclaims to be permissive in the Bankruptcy Court.

In sum, many courts have found that the filing of a counterclaim against a trustee in an Adversary Proceeding does not constitute a waiver of the right to a jury trial. See, e.g., *Busch-Provo, Ltd. V. Sloan (In re Larsen)*, 172 Bankr. 988, 993 (D. Utah 1993). The court in *Larsen* explained that when a proof of claim is filed, the process of allowance and disallowance of claims is triggered. *Id.* at 992 (citing *Langenkamp*, 498 U. S. at 44). However, when the trustee files an adversary complaint and there is a timely jury demand along with the assertion of counterclaims, then those counterclaims are part of the "jury trial process," rather than the process of allowance and disallowance of claims. *Id.* at 993. As a consequence, the right to a jury is not waived. *Id.* In New York the Federal District Court reasoned that allowing the assertion of a counterclaim to act as a waiver "would be to condone jurisdiction by ambush."

*J.T. Moran Fin. Corp. v. American Consol . Fin. Corp. (In re J.T. Moran Fin. Corp.*, 124 Bankr.

931, 940 (S.D.N.Y. 1991).

Thus, courts are not eager to embrace an implied waiver of constitutional rights, where

there is an affirmative and timely assertion of those rights.  See e.g., *Parke v. Raley,* 506 U.S. 20,

28-29 (1992) (guilty plea must be knowing and voluntary because it waives the right to a jury

trial, the right to confront one's accusers, and the privilege against self incrimination); see also

*Data Compass Corp. v. Datafast, Inc. (In re Data Compass Corp.)*, 92 Bankr. 575, 578 (Bankr.

E.D.N.Y. 1988) ("A waiver of any constitutional right must be knowing, voluntary, and

intelligent").  Therefore, because Robinson affirmatively and timely asserted his right to a trial

by jury; it would not serve justice to find that, by operation of law, he had waived his Seventh

Amendment right to a trial by jury.  <u>The constitutional right to a trial by jury is not so ephemeral</u>.

### III.  <u>CONCLUSION</u>

On the basis of the arguments set forth in Robinson's Memorandum Supporting His

Motion to Withdraw the Reference; and, in this Reply, the Court should grant his Motion and

withdraw the reference to the Bankruptcy Court.

> Respectfully submitted
> for the defendant,
> David G. Robinson
> by his attorney:
>
>
> Theodore E. Dinsmoor (BBO #125540)
> Burns & Levinson LLP
> 125 Summer St.
> Boston, MA  02110
> (617) 345-3000
> (617) 345-3299 facsimile

Dated:  April 5, 2005

## CERTIFICATE OF SERVICE

I, Theodore E. Dinsmoor, hereby certify that on this 5th day of April 2005, a true copy of the above document was served by First Class Mail upon the attorney of record for each other party on the following Service List.

   /s/ *Theodore E. Dinsmoor*
Theodore E. Dinsmoor

## SERVICE LIST

| Plaintiff:<br>John J. Aquino | Represented by | John J. Aquino, Esq.<br>Philip C. Silverman, Esq.<br>Anderson Aquino LLP<br>260 Franklin St.<br>Boston, MA  02110<br><br>and<br><br>Charles A. Dale, Esq<br>Daniel J. Kelly, Esq.<br>Gadsby Hannah LLP<br>225 Franklin St.<br>Boston, MA  02110-1617 |
|---|---|---|
| Defendants:<br>Amadeus Capital Corporation<br>Amadeus Capital U.S. Inc.<br>Miles S. Nadal<br>Robert Balfour<br>Gavin Swartzman<br>Trevor Maunder<br>Michael Simonetta | Represented by | Carrie J. Fletcher, Esq.<br>Erica Templeton Spencer, Esq.<br>Foley & Lardner LLP<br>111 Huntington Ave., 26th Floor<br>Boston, MA  02199 |
| Defendants:<br>James D. Fisher<br>Deszo Horvath | Represented by | R. Todd Cronan, Esq.<br>Daniel J. Pasquarello, Esq.<br>Goodwin Procter LLP<br>Exchange Place<br>Boston, MA  02109 |
| Defendants:<br>David C. Kassie<br>Dean C. Kehler | Represented by | Eben P. Colby, Esq.<br>Skadden Arps Slate<br>   Meagher & Flom, LLP<br>One Beacon St.<br>Boston, MA  02109 |
| Defendants:<br>Stephen M. Pustil<br>Thomas Volpe<br>Derek Smith | Represented by | Timothy J. Langella, Esq.<br>Benjamin B. Tymann, Esq.<br>Adrienne K. Walker, Esq.<br>Mintz, Levin, et al.<br>One Financial Center<br>Boston, MA  02111 |

**APPENDIX A**



First
KN WLEDGE
PARTNERS
International

December 3, 1999

Mr. David Robinson
300 Boylston Street, #608
Boston, MA
02116

Dear David:

I am delighted to offer you the position of President & Chief Executive Officer for First Knowledge Partners ("FKP") and a seat on the our Board of Directors. This letter and the attached appendices serve to confirm the details of the agreement that has been reached between First Knowledge Partners and you.

1.    **Title**

You will be joining First Knowledge Partners (FKP) in the position of President and Chief Executive Officer, reporting and accountable to myself and the Board of Directors. You will be asked to build on the current FKP business and acquisition strategy, create a leading network of high quality and profitable management consulting firms, and meeting or exceeding the strategic and financial goals reasonably agreed with the board. Part of your role will be establishing the head office functions for FKP and building a top caliber management team.

2.    **Base Salary**

You will be paid a base salary of $500,000 per year, to be paid semi-monthly in equal installments.

3.    **Performance bonus**

You will be eligible for a performance bonus of up to $250,000 per year, of which $100,000 will be guaranteed in year 1.

The year will be on the anniversary of your start-date or a mutually agreed upon date corresponding with the FKP fiscal year. The eligible bonus will be paid within 60 days of the relevant year-end. In addition you will be eligible each year for a mid-year draw of up to 40% of potential target bonus, based on the mid-year performance vs. target. Mid-year draw will be paid within 30 days of sixth month. Year one midyear draw will be $100,000.



David Robinson
Employment Offer
December 3, 1999
Page 2

The basis for the performance bonus is demonstrating clear progress towards FKP's goals, and accordingly they vary from year to year. Revenue metrics will be based on the trailing 12 months' revenue for each deal at the time of closing.

<u>Year 1 Targets</u>

100% of target bonus will be awarded if either of the two following conditions is met:

- Two or more deals are closed by end of year 1 totaling $20 million in aggregate revenues.
- At least one deal is closed by end of year 1 totaling at least $7.5 million in revenue, and the deal pipeline in my judgment is strong enough to expect to have closed 4 deals or more in total by the end of the second year, with aggregate revenues by the end of year 2 of $60 million.

If neither condition is met, bonus in excess of the guarantee is entirely at my discretion.

<u>Year 2 Targets</u>

100% of target bonus will be awarded if the following conditions are met:

1. At least four deals have been closed from FKP inception to end of year 2 totaling $60 million in aggregate revenues, with growth and profit economics meeting expectations
2. The pipeline in my judgment is strong enough to close at least 2 deals in year 3 with aggregate revenues of an additional $40 million.

50% of target bonus will be awarded if:

1. A minimum of three deals are closed from FKP inception to end of year 2 totaling $40-59 million with growth and profit economics tracking deal expectations
2. The deal pipeline in my judgment is strong enough to create aggregate revenues of $80 million by end of year 3.

If neither of these conditions is met, bonus is entirely at my discretion.

<u>Year 3 and beyond</u>

Mutually agreeable performance targets for years 3 and beyond will be negotiated between you and I and the board, no later than 60 days into the respective year.

<u>Qualitative judgments</u>

David Robinson
Employment Offer
December 3, 1999
Page 3

I may adjust the bonus based on my qualitative judgments of performance at the time of award, but the maximum downward adjustment will be 10% of the bonus amount indicated by the metrics.

<u>Annual Increases</u>

In addition, the initial base and bonus targets will be increased each year at least 5% or the U.S. CPI, whichever is greater, with the percentage applied pro-rata to base and performance bonus.

**4.    Share purchase**

You will be expected to purchase $250,000 of First Knowledge Partners shares from the management pool (63,775 shares @ $3.92 per share).

You are also eligible for an interest-free loan of up to $750,000 for the purchase of additional shares. You will be expected to initially borrow a minimum of $250,000 within 60 days of your start date to purchase an additional 63,775 shares at the same share price as above. Any shares acquired after that date will be priced at the current valuation (see section 8)

We will jointly investigate the U.S. tax implications of granting interest free loans. If it is not possible to provide interest free loans on a tax-free basis, FKP make the necessary adjustments to put you on an equivalent basis.

**5.    Option Grant**

You will be granted 200,000 FKP options from 2 option pools.

1.  100,000 standard options @ $5.00 exercise price, vesting 1/3 per year at the end of each of the first three years.
2.  100,000 performance options @ $5.00 exercise price, vesting at the time FKP has a qualified IPO or private sale, vesting straight line in the IRR range of 15-40%. The mechanics of the IRR calculation follow the methodology used in Appendix A.

Options and shares are subject to the terms and conditions set out in the common and preferred shares term sheet in Appendix B.

**6.    Benefits**

You will be entitled to participate in the FKP executive benefit plan that will include health, dental, life and disability insurance. Since one of your tasks in launching FKP is



David Robinson
Employment Offer
December 3, 1999
Page 4

establishing a US benefits plan, no plan currently exists. However, I will commit to providing you at minimum the following:

- Long term disability coverage of $22,500 per month, or greater if specified by the FKP plan. You will participate if that is needed to create tax-free benefits.
- $1.7 million death-benefit life insurance
- 20 days annual paid vacation.
- Appropriate medical and dental coverage

Until the U.S. company is incorporated and the benefit plans are in place, we will reimburse you for any out of pocket expenses incurred in securing the above insurance coverage yourself. The benefits plan for FKP should be a similar in standard and spirit to that which is in place for MDC and FIAMI executives, with necessary allowances for differences in the US marketplace.

<u>401k Plan</u>

You will be eligible for any FKP 401K or equivalent tax-deferred plan if and as of when they are established for FKP's employees.

<u>Car Allowance</u>

You will be provided a cash car allowance of $1,000 per month.

<u>Expenses</u>

You will be reimbursed for all out of pocket expenses reasonably and properly incurred in conjunction with your duties.

7.   **Severance**

7.1. **Termination**

I recognize that circumstances may arise that would lead to your dismissal. Should the Board and I terminate your employment for reasons other than cause, the following terms would apply.

<u>Termination with first 9 months of employment</u>

If you were to be terminated <u>within</u> the first 9 months of employment, the following severance would be made available:

- Cash compensation of 6 months salary plus guaranteed bonus ($300,000 total payment) paid semi-monthly over 6 months.
- Repayment of share purchase price ($500,000) in return for the 127,550 common shares issued, plus a guaranteed return on the $250,000 shares purchased outright based on US prime interest rate.



David Robinson
Employment Offer
December 3, 1999
Page 5

- FKP will continue to pay all current benefits costs and will keep all benefits programs in place during the severance period.

## Termination after 9 months of employment

If you were to be terminated after the first 9 months of employment, the following severance would be made available:

- Cash compensation of 6 months current salary plus guaranteed bonus ($300,000 total payment) paid semi-monthly over 6 months.

- Up to an additional 6 months current base salary paid on a month-to-month basis until you secure new full time employment, at which point severance payments cease. The additional 6 months would be awarded on the basis of 1 month additional salary for every 2 months worked beyond the initial 9 month period.

- Any shares outstanding or vested options would be sold back to FKP as soon as possible, but in no event later than 30 days after termination, and valued according to the terms outlined in section 8.

- FKP will continue to pay all current benefits costs and will keep all benefits programs in place during the severance period.

### 7.2. Termination due to change of control

To protect you against a deemed "change in control" which substantially alters the conditions of your employment, the following severance would be made available:

- 6 months salary minimum plus an additional 6 months current base salary on a month-to-month basis until you secure new full time employment, at which point severance payments cease.

- Your accrued bonus for the current fiscal year to date will be paid at target bonus level, without reflecting performance metrics or discretionary judgment. (For example, if change of control occurs in the ninth month of the second year of employment, and target bonus is $262,500 in year 2, then a one-time payment of $196,875, less any draw already paid, would be made).

- For the six months following termination based on change of control pro-rata target bonus will be paid.

- You may elect to put all or a portion of your shares and vested options back to FKP for redemption at the formula valuation and keep the remaining shares.

- Any remaining unvested portion of option lot 1 will immediately vest.

- FKP will continue to pay all current benefits costs and will keep all benefits programs in place during the severance period.

David Robinson
Employment Offer
December 3, 1999
Page 6

For the purposes of this offer letter, change of control is defined as one of the following:

- Private sale of FKP in which you have not been an active participant as CEO.
- Miles Nadal is no longer Chairman of FKP
- 50% or more of the FKP Board changes in any one year.
- Demotion from your position as CEO
- A reduction in compensation
- You are required to move your residence from Boston.

If there is a change of control as herein defined, and the company offers you continued employment, you have the option to accept continued employment or trigger the severance provisions in Section 7.2

### 7.3. Voluntary resignation or termination for cause

Should you voluntarily resign from FKP or should you be terminated for cause (as defined in section 7.4) the following terms would apply:

- You would not be eligible for severance
- The loan will be due and payable immediately
- Vested options and shares must be sold back to FKP at the valuation outlined in section 8 immediately.

### 7.4. Definition of "Cause"

For the purposes of this offer letter, the term "Cause" shall mean any of the following: embezzlement, fraud; dishonesty; breach of fiduciary duty to the Company; deliberately disregarding the rules of the Company which results in a material loss, damage or injury to the Company; unauthorized disclosures of any of the trade secrets of confidential information of the Company; a material breach of any agreement (including this Agreement) with the Company; inducement of any representative that acts for the Company to terminate such relationship which termination results in material damage to the Company; or engaging in any conduct which constitutes unfair competition with the Company.

### 7.5. Treatment for disability or death

Disability, for the purposes of this agreement, is defined as when you qualify for long-term disability under the company's long-term disability insurance program. Should this occur, the following would apply:

- The company has the option to terminate employment



David Robinson
Employment Offer
December 3, 1999
Page 7

- In the case where you were terminated, no severance would be payable, since the insurance coverage takes over

- Vested options and shares in FKP which you own, would be sold back to the company according to terms outlined section 8, within a 3 months period from time of disability.

In the event of your death, no further payments are required, except where the company would be required to make payments under the terms of its employee benefit plans. Vested options and shares in FKP which you own, would be sold back to the company according to terms outlined in Section 8, within a 3 month period from time of death.

### 8. Valuation of Equity in connection with cessation of employment

Any shares or options redeemed prior to IPO or private sale of FKP in connection with cessation of your employment will be valued as follows (options will be exercised):

- At the valuation as of the previous liquidity event: either additional equity financing, or shares given as consideration on acquisition.

- If the previous liquidity event has occurred at least six months prior to cessation of your employment, then the price will be adjusted to any material change in financial performance (based on trailing EBITDA). For example if the previous liquidity event valued First Knowledge Partners at 8 times trailing 12 months EBITDA, this multiple would be applied to the 12 months trailing EBITDA at the time of cessation of employment.

- During the first 12 months shares would not be valued at less than the issue price.

### 9. Governing Law

Your employment will be governed under Massachusetts's law. Your employment agreement, represented in this letter, is initially between you and First Knowledge Partners, a Canadian corporation. We intend to establish a U.S. corporation as soon as possible, and your employment agreement will then be assumed by the U.S. corporation.

### 10. Non-solicit clause

During your term of employment, and for a period of two years following the termination of your employment, you will not directly or indirectly:



David Robinson
Employment Offer
December 3, 1999
Page 8

- Recruit, solicit or induce, or attempt to induce, any employee or employees of FKP, MDC, Maxxcom, FIAMI or their subsidiaries to terminate their employment with, or otherwise cease their relationship with, these companies or their subsidiaries.

- Solicit the business or patronage of any of the clients, customers or accounts, or prospective customers or accounts, of FKP or its subsidiaries which were solicited or served directly by you during the two years prior to the termination of your employment.

- Attempt to acquire, or assist others in acquiring, firms with whom FKP had meaningful acquisition discussions during the 12 months prior to the termination of your employment.


**11.   Non-compete clause**

You will agree for a period of 12 months following the termination of employment not to work as an employee or director of, or to invest in, any professional services firm whose **primary** strategy for growth is acquisition of other professional services firms such that it would compete with FKP for acquisition candidates.  You are not restricted from working as an employee or director, or investing in, any other professional services company, including firms which would acquire other firms as a supporting, but not primary, growth strategy.

**12.   Intellectual property and confidentiality**

In your role as President and CEO of FKP, you will develop in conjunction with FKP's attorneys a standard intellectual property rights and nondisclosure agreement, to be used for FKP employees and in acquisitions, which will be approved by me, and which you agree you will sign.  In principle, this agreement will assign ownership to FKP of all intellectual property created by its employees after they commence employment, and will allow them to retain rights to intellectual property they created prior to their employment. The agreement will necessarily be tailored for each acquisition according to the specific terms of the deal.

This agreement will also specify usual and customary nondisclosure terms for protecting confidential FKP information, and the confidentiality of client information.  Until this agreement has been prepared and executed, you agree to continue to be bound by the confidentiality agreement executed with you on November 2, 1999 by Russell Reynolds on FKP's behalf.



David Robinson
Employment Offer
December 3, 1999
Page 9

### 13. Effective Date, Start Date and Signing Bonus

Your formal employment will commence on January 1, 2000. The obligations of both parties under this agreement will commence when this letter has been signed by both parties (including severance provisions to commence January 1, 2000 should termination occur, or if FKP does not commence with your employment, after this letter has been signed by both parties, but prior to formal commencement of employment). No later than January 15, 1999, you will receive a signing bonus of $25,385.

### 14. Monetary References
All references in this letter to monetary amounts are in U.S. dollars.

If the terms outlined in the letter are acceptable, please execute both originals of this letter and return one executed original to us. You may retain the other original for your records. Should you accept the terms set forth in this offer, we would like you to start at your earliest possible convenience, but no later than January 1, 2000. We should formalize this start date as soon as possible.

As you know, these letters of offer, out of necessity tend to be formal in nature. I hope that this does not mask the enthusiasm I have for you joining First Knowledge Partners. I look forward to working with you on what will be an exciting and profitable new business.

If you have any questions regarding this offer, please do not hesitate to contact me.

Very truly yours,

Miles S. Nadal
Chairman


AGREED:

DAVID G. ROBINSON

MSN:dm

**APPENDIX B**

# COPY

## PROMISSORY NOTE

**AMOUNT:   US$250,000**

**DATE: March 13, 2000**

**FOR VALUE RECEIVED,** the undersigned, DAVID G. ROBINSON (the "Debtor"), acknowledges himself indebted to, and unconditionally promises to pay to or to the order of, FIRST KNOWLEDGE PARTNERS INC. (the "Holder"), at 28 State Street, Suite 1100, Boston, MA 02109, the sum of Two Hundred and Fifty Thousand Dollars ($250,000) in lawful money of the United States of America, as hereinafter provided.

The obligations of the Debtor under this promissory note are secured by a pledge by the Debtor in favor of the Holder of 31,875 Class A Subordinate Voting Shares and 31,875 Class B Multiple Voting Shares in the capital of the Holder issued in the name of the Debtor (the "Pledged Shares"). The Debtor acknowledges and agrees that notwithstanding the foregoing pledge of shares, the Holder shall use all commercially reasonable efforts to realize upon such security but shall not be obliged to and that in the event that the Holder does so, it retains its rights of recourse against the Debtor with respect to any deficiency owing pursuant to the provisions of this promissory note after the sale or other disposition of the Pledged Shares.

The principal amount owing under this promissory note shall be due and payable in full, subject to the terms and conditions set out in this note, in the event of termination of the Debtor's employment with the Holder, on the date that is twelve months after the date the Debtor ceases to be employed by the Holder and in the event of resignation or termination for cause by the Debtor from employment with the Holder, on the date of resignation or termination for cause. For greater certainty, the terms and conditions set out in this note shall comply with the provisions of the employment contract between the Debtor and the Holder dated December 3, 1999. US$3.92157 of the principal amount owing under this promissory note shall be due and payable subject to the terms and conditions in this note, upon the sale or other disposition of each of the Pledged Shares by the Debtor, on the date that is five days after the date of such sale of other disposition. No sale or other disposition of the shares may be effected by the Debtor without complying with all applicable shareholders agreements that restrict transfers of the shares, and the provisions of the certificate of incorporation, as amended, of the Holder. Amounts owing under this promissory note may also be prepaid by the Debtor, in whole or in part, at any time without notice or bonus or penalty.

The Debtor hereby waives demand, presentment, protest, dishonor and notice of dishonor in respect hereof. The failure of the Holder to exercise any of its rights hereunder in any instance shall not constitute a waiver thereof in that or any other instance.

In the event that the Debtor shall fail to make the payments provided for pursuant to the provisions of this promissory note when due or in the event that the Debtor becomes bankrupt or insolvent, the entire principal sum then outstanding shall immediately become due and payable at the option of the Holder, exercisable upon notice given to the Debtor. Following any such acceleration of the sum due hereunder, the Debtor hereby agrees to pay all costs and expenses (including all reasonable legal costs) paid or incurred by the Holder in collecting the principal of and interest accrued hereunder.

This promissory note shall be governed by and construed in accordance with the laws of the State of Delaware.

**DATED** as of the ___13th___ day of March, 2000.

David G. Robinson

K:\E Vardin\WpData\First Knowledge\Documents\Pnote-Robinson.wpd/tsc

**APPENDIX C**

## STOCK PLEDGE AGREEMENT

STOCK PLEDGE AGREEMENT, dated as of March 13th, 2000, between David G. Robinson ("Pledgor") and First Knowledge Partners Inc. ("Pledgee").

W I T N E S S E T H :

WHEREAS, Pledgor has purchased 63,750 shares of Class A Subordinate Voting Stock and 63,750 shares of Class B Multiple Voting Stock of the Pledgee;

WHEREAS, Pledgee has agreed to loan US$250,000 (the "Loan") to Pledgor to be used in connection with the purchase of the 63,750 shares of Class A Subordinate Voting Stock and 63,750 shares of Class B Multiple Voting Stock of the Pledgee;

WHEREAS, Pledgor has executed and delivered a promissory note in the principal amount of US$250,000, dated March 13th, 2000 (the "Note"); and

WHEREAS, as a partial inducement to Pledgee to extend the Loan, Pledgor has agreed to provide security for the payment of the Loan;

NOW, THEREFORE, in consideration of the premises and the covenants set forth herein, the parties hereto agree as follows.

1.     Definitions.  References to this "Agreement" shall mean this Stock Pledge Agreement as the same may be in effect at the time such reference becomes operative, including all amendments, modifications and supplements hereto and any exhibits or schedules to any of the foregoing.

2.     Pledge.  In order to secure the payment and performance in full of all of the obligations pursuant to the note, Pledgor hereby pledges, assigns, grants a security interest in, transfers and delivers unto Pledgee each of the following (the "Collateral"):

(a)     all of Pledgor's right, title and interest in and to the 31,875 shares of Class A Subordinate Voting Stock and 31,875 shares of Class B Multiple Voting Stock of the Pledgee (the "Pledged Shares") and the certificates, if any, representing the Pledged Shares, and all dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Shares;

(b)     all other rights appurtenant to the property described in clauses (a) above (including, without limitation, voting rights); and

(c)     all cash and noncash proceeds of any and all of the foregoing.

Certificates representing the Pledged Shares, accompanied by proper instruments of assignment duly executed in blank by Pledgor, are herewith delivered to Pledgee.

3.     Representations and Warranties.  Pledgor hereby represents and warrants to Pledgee that as of the date hereof:

(a)     Pledgor is the sole holder of record and beneficial owner of the Pledged Shares, free and clear of any pledge, hypothecation, assignment, lien, charge, claim, security interest, option, preference, priority or other preferential arrangement of any kind or nature whatsoever ("Lien") thereon or affecting the title thereto.

(b)     The Pledgor has the right to pledge, assign, grant a security interest in, transfer and deliver the Collateral to Pledgee as provided herein.

(c)     This Agreement has been duly authorized, executed and delivered by Pledgor and constitutes the legal, valid and binding obligation of Pledgor, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity.

(d)     No consent, approval, authorization or other order of any Person is required for (i) the execution and delivery of this Agreement by Pledgor or the delivery by Pledgor of the Collateral to Pledgee as provided herein, or (ii) for the exercise by Pledgee of the voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with the disposition of the Collateral by laws affecting the offering and sale of securities generally.

(e)     The address of Pledgor is set forth in Section 15.

(f)     Upon the delivery to Pledgee of the certificates representing the Pledged Shares, Pledgee will have a valid and perfected security interest therein subject to no prior Lien.

The representations and warranties set forth in this Section 3 shall survive the execution and delivery of this Agreement.

4.      Rights of Pledgor.  Unless an Event of Default shall have occurred and be continuing:

(a)     Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Shares or any part thereof for any purpose not inconsistent with the terms of this Agreement or the Note; provided, that Pledgor shall not exercise or refrain from exercising such right if, in Pledgee's judgment, such action would have a material adverse effect on the value of the Pledged Shares or any part thereof, and provided, further, that Pledgor shall give Pledgee at least five days' prior written notice of the manner in which it intends to exercise, or the reasons for refraining from exercising, any such right.

(b)     Pledgor shall be entitled, from time to time, to collect and receive for its own use all cash dividends (except cash dividends paid or payable in respect of the total or partial liquidation of an issuer) paid on the Pledged Shares; provided, however, that until actually paid, all rights to such dividends shall remain subject to the lien of this Agreement.  All dividends (other than cash dividends governed by the immediately preceding sentence) and all other distributions in respect of any of the Collateral, whenever paid or made, shall be delivered to Pledgee and held by it subject to the lien created by this Agreement.

5.      Covenants.  Pledgor covenants and agrees that until the termination of this Agreement:

(a)     Pledgor will not, without the prior written consent of Pledgee, sell, assign, transfer, mortgage, pledge or otherwise encumber any of its rights in or to the Collateral or any dividends or other distributions or payments with respect thereto or grant a lien on any thereof.

2

(b)    Pledgor will, at its own expense, execute, acknowledge and deliver all such instruments and take all such action as Pledgee from time to time may reasonably request in order to ensure to Pledgee the benefits of the first priority lien on and to the Collateral intended to be created by this Agreement.

(c)    Pledgor will defend the title to the Collateral and the lien of Pledgee thereon against the claim of any Person claiming against or through Pledgor and will maintain and preserve such lien so long as this Agreement shall remain in effect.

6.    <u>Events of Default.</u>    The following events shall constitute Events of Default:

(a)  **Failure to Make Payment:**  If the Pledgor fails to pay when due any amount owing by the Pledgor to the Pledgee pursuant to the terms of the Note within five (5) days of the date upon which any such amount is due;

(b)  **Default Under Security Agreement:**  If the Pledgor fails to observe or perform any of the covenants and obligations, in accordance with their terms, under the Note or this Agreement other than as provided in subsection 6.1(a) and such non-observance or non-performance has not been corrected within ten (10) days of receiving written notice from the Pledgor to cure such default;

(c)  **Appointment of Receiver:**  If any of the following events occur:

(i) a receiver or other custodian (interim or permanent) of the Pledgor or the Pledged Shares or any part thereof is appointed by private instrument or by court order;

(ii) if any execution, sequestration, extent or other process of any court becomes enforceable against the Pledgor or the Pledged Shares or any part thereof; or

(iii) if distress or analogous process is made against the Pledgor or the Pledged Shares or any part thereof;

(d)  **Insecurity:**  In the event that the Pledgor, acting reasonably, deems itself to be insecure.

7.    <u>Remedies in an Event of Default.</u>

(a)    Upon the occurrence of an Event of Default, then or at any time during the continuance of such occurrence, Pledgee is hereby authorized and empowered, at its election, (i) to transfer and register in its or its nominee's name the whole or any part of the Collateral, (ii) to exercise all voting rights with respect thereto, (iii) to demand, sue for, collect, receive and give acquittance for any and all cash dividends or other distributions or monies due or to become due upon or by virtue thereof, and to settle prosecute or defend any action or proceeding with respect thereto, (iv) to sell in one or more sales the whole or any part of the Collateral or otherwise to transfer or assign the same, applying the proceeds therefrom to the payment of the obligations under the Note in such order as Pledgee shall determine, and (v) otherwise to act with respect to the Collateral or the proceeds thereof as though Pledgee were the outright owner thereof, Pledgor hereby irrevocably constituting Pledgee as its proxy and attorney-in-fact, with full power of substitution to do so.

(b)    Pledgee shall give Pledgor not less than ten days' prior written notice of the time and place of any sale or other intended disposition of any of the Collateral except any Collateral that threatens to decline speedily in value or is of a type customarily sold on a recognized market. Pledgor agrees that such notice constitutes "reasonable notification" within the meaning of Section 9-504(3) of the Uniform Commercial Code. Any sale shall be made at a

3

public or private sale at Pledgee's place of business, or at any public building in The City of Wilmington to be named in the notice of sale, either for cash or upon credit or for future delivery at such price as Pledgee may deem fair, and, to the extent permitted by applicable law, Pledgee may be the purchaser of the whole or any part of the Collateral so sold and hold the same thereafter in its own right free from any claim of Pledgor or any right or equity of redemption, which right or equity is hereby waived and released. Each sale shall be made to the highest bidder, but Pledgee reserves the right to reject any and all bids at such sale which, in its sole discretion, it shall deem inadequate. Except as otherwise herein specifically provided for, demands of performance, notices of sale, advertisements and the presence of property at sale are hereby waived and any sale hereunder may be conducted by an auctioneer or any officer of agent of Pledgee.

(c)       If, at the original time or times appointed for the sale of the whole or any part of the Collateral, either (i) the highest bid, if there be but one sale, shall be inadequate to discharge in full all the obligations under the Note, or (ii) if the Collateral be offered for sale in lots, if at any of such sales the highest bid for the lot offered for sale would indicate to Pledgee in its sole discretion the unlikelihood of the proceeds of the sales of the whole of the Collateral being sufficient to discharge all the obligations under the Note, then in either such event Pledgee may, on one or more occasions, postpone any of said sales by public announcement at the time of sale. In the event of any such postponement, Pledgee shall give Pledgor notice of such postponement.

(d)       If, following an Event of Default, Pledgee, in its sole discretion, determines that it is necessary or advisable to effect a public registration of all or part of the Collateral pursuant to the Securities Act of 1933, as amended (the "Act"), then Pledgor shall use its best efforts to cause the issuer or issuers of the Pledged Shares contemplated to be sold, to execute and deliver, and cause the directors and officers of such issuer to execute and deliver, all at Pledgor's expense, all such instruments and documents, and to do or cause to be done all such other acts and things as may be necessary or, in the reasonable judgment of Pledgee, advisable to register such shares under the provisions of the Act and to cause the registration statement relating thereto to become effective and to remain effective for a period of 9 months from the initial effective date thereof, and to make all amendments thereto or to the related prospectus or both that, in the reasonable judgment of Pledgee, are necessary or advisable, all in conformity with the requirements of the Act and the rules and regulations promulgated thereunder; provided that, if shares other than the Pledged Shares are registered, Pledgor shall be obligated only to pay a *pro rata* portion of expenses. Pledgor agrees to use its best efforts to cause such issuer or issuers to (i) comply with the provisions of the securities or "Blue Sky" laws of any jurisdiction designated by Pledgee and (ii) make available to its security holders, as soon as practicable, an earnings statement that will satisfy the provisions of Section 11(a) of the Act.

(e)       All reasonable expenses incurred in complying with Section 7(d), including, without limitation, all registration and filing fees (including all expenses incident to filing with the National Association of Securities Dealers, Inc.), printing expenses, fees and disbursements of counsel for Pledgor or for the issuers of the Pledged Shares, the reasonable fees and expenses of counsel for Pledgee, expenses of any special audits incident to or required by any such registration and expenses of complying with the securities or blue sky laws or any jurisdictions, shall be paid by Pledgor.

(f)       If, at any time when Pledgee shall determine to exercise its right to sell the whole or any part of the Collateral hereunder, such Collateral or the part thereof to be sold shall not, for any reason whatsoever, be effectively registered under the Act, Pledgee may, in its sole and absolute discretion (subject only to applicable requirements of law), sell such Collateral

4

or part thereof by private sale in such manner and under such circumstances as Pledgee may deem necessary or advisable, but subject to the other requirements of this Section 7, and shall not be required to effect such registration or to cause the same to be effected. Without limiting the generality of the foregoing, in any such event Pledgee in its sole and absolute discretion may (a) proceed to make such private sale notwithstanding that a registration statement for the purpose of registering such Collateral or part thereof could be or shall have been filed under the Act (or similar statute), (b) approach and negotiate with a single possible purchaser to effect such sale, (c) restrict such sale to a purchaser who will represent and agree that such purchaser is purchasing for its own account, for investment and not with a view to the distribution or sale of such Collateral or part thereof, and (d) require that any sale hereunder (including a sale at auction) be conducted subject to restrictions (i) as to the financial sophistication and ability of any Person permitted to bid or purchase at sale, (ii) as to the content of legends to be placed upon any certificates representing the Collateral sold in such sale, including restrictions on future transfer thereof, (iii) as to the representations required to be made by each Person bidding or purchasing at such sale relating to that Person's access to financial information about Pledgor, any of the issuers of the Pledged Shares or Pledgee, such Person's intentions as to the holding of the Collateral so sold for investment, for its own account, and not with a view to the distribution thereof, and (iv) as to such other matters as Pledgee may, in its sole discretion, deem necessary or appropriate in order that such sale (notwithstanding any failure so to register) may be effected in compliance with the Uniform Commercial Code and other laws affecting the enforcement of creditors' rights and the Act (or similar statute) and all applicable state securities laws. Pledgor will execute and deliver such documents and take such other action as Pledgee deems necessary or advisable in order that any such sale may be made in compliance with law.

(g)     Pledgor acknowledges that: (i) any sale under the circumstances described in this Section 7 shall be deemed to have been held in a manner which is commercially reasonable, and (ii) notwithstanding the legal availability of a private sale or a sale subject to restrictions of the character described above, Pledgee may, in its sole discretion, elect to seek registration of the Collateral under the Act (or similar statute or any applicable state securities laws) in accordance with its rights under this Section 7. In the event of any such sale under the circumstances described in this Section 7, Pledgee shall incur no responsibility or liability for selling the whole or any part of the Collateral at a price which Pledgee may deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might be realized if the sales were deferred until after registration as aforesaid. Pledgor hereby acknowledges that any sale of any of the Collateral which has not been registered under the Act may be for a price less that which might have been obtained had the Collateral been registered under the Act.

(h)     Pledgor agrees that it will not at any time plead, claim or take the benefit of any appraisal, valuation, stay, extension, moratorium or redemption law now or hereafter in force in order to prevent or delay the enforcement of this Agreement, or the absolute sale of the whole or any part of the Collateral or the possession thereof by any purchaser at any sale hereunder, and Pledgor waives the benefit of all such laws to the extent it lawfully may do so. Pledgor agrees that it will not interfere with any right, power and remedy of Pledgee provided for in this Agreement or now or hereafter existing at law or in equity or by statute or otherwise, or the exercise or beginning of the exercise by Pledgee of any one or more such rights, powers or remedies. No failure or delay on the part of Pledgee to exercise any such right, power or remedy, and no notice or demand which may be given to or made upon Pledgor by Pledgee with respect to any such remedies, shall operate as a waiver thereof, or limit or impair Pledgee's right to take any action or to exercise any power or remedy hereunder without notice or demand, or prejudice its rights as against Pledgor in any respect.

5

(i)        Pledgor agrees to indemnify and hold harmless Pledgee and each Person who controls Pledgee within the meaning of either the Act or the Securities Exchange Act of 1934 against any and all losses, claims, damages or liabilities, joint or several, to which Pledgee or such Person may become subject under the Securities Act, the Securities Exchange Act of 1934 or other Federal or state statutory law or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the registration statement for the registration of the Collateral as originally filed or in any amend-ment thereof, or in any preliminary prospectus or the prospectus, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent that any such loss, claim, damage or liability arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information furnished to Pledgee by or on behalf of Pledgor specifically for use in connection with the preparation thereof and agrees to reimburse each such indemnified party for any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability or action.

8.        Exoneration of Pledgee.  Other than the exercise of reasonable care in the custody and preservation of the Collateral, Pledgee shall have no duty with respect thereto. Pledgee shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any agent or bailee selected by Pledgee in good faith.

9.        Waiver.  No delay on Pledgee's part in exercising any power of sale or other right hereunder, and no notice or demand which may be given to or made upon Pledgor by Pledgee with respect to any power of sale or other right hereunder, shall constitute a waiver thereof, or limit or impair Pledgee's right to take any action or to exercise any power of sale or any other right hereunder, without notice or demand, or prejudice Pledgee's rights as against Pledgor in any respect.

10.        Assignment.  Neither party may assign its rights under this agreement, except that in the event of assignment by Pledgee of its rights under the Note in accordance therewith, the party to whom such assignment is made shall be entitled to Pledgee's rights hereunder.

11.        Termination.  At such time as (a) all obligations under the Note and this Agreement have been fully satisfied and (b) the Note shall have been terminated, Pledgee shall deliver to Pledgor the Collateral at the time subject to this Agreement and all instruments of assignment executed in connection therewith, free and clear of the lien hereof and all of Pledgor's obligations hereunder shall thereupon terminate.  When so released, such Collateral shall be free and clear of any lien or encumbrance hereunder.

12.        Release.  Pledgor consents and agrees that Pledgee may at any time, or from time to time, in Pledgee's sole discretion, exchange, release and/or surrender all or any of the Collateral, or any part(s) thereof, by whomever deposited, which is now or may hereafter be held by Pledgee in connection with all or any of the obligations under the Note; all in such manner and upon such terms as Pledgee may deem proper, and without notice to or further assent from Pledgor, it being hereby agreed that Pledgor shall be and remain bound by this Agreement, irrespective of the existence, value or condition of any collateral and notwith-

standing (i) any such exchange, release and/or surrender and/or (ii) any settlement, compromise, surrender, release, renewal or extension of any or all of the obligations under the Note, and/or (iii) that the obligations under the Note may at any time or from time to time exceed the aggregate principal amount outstanding pursuant to the Note.

13.    <u>Expenses</u>. Pledgor will reimburse Pledgee for all reasonable expenses (including reasonable expenses for legal services of every kind) of, or incidental to the prepara-tion or enforcement of any of the provisions of, this Agreement or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement of any of the Collateral and for the care of the Collateral and defending or asserting the rights and claims of Pledgee in respect of the Collateral, by litigation or otherwise, including but not limited to expenses of insurance and the fees and expenses of counsel for Pledgee. All such expenses shall be deemed additional Obligations.

14.    <u>Miscellaneous</u>.

(a)    Pledgee may execute any of its duties hereunder by or through agents or employees. Pledgee may consult with legal counsel and any action taken or suffered in good faith in accordance with the advice of such counsel shall be full justification and protection to it.

(b)    Neither Pledgee nor any of its officers, directors, employees, agents or counsel shall be liable for any action lawfully taken or omitted to be taken by it or them hereunder or in connection herewith, except for their own gross negligence or willful miscon-duct and Pledgee shall not be liable for any error of judgment made by it in good faith.

(c)    This Agreement shall be binding upon Pledgor and its successors and assigns, and shall inure to the benefit of, and be enforceable by, Pledgee and its successors, transferees and assigns. None of the terms or provisions of this Agreement may be waived, altered, modified or amended except in writing duly signed for and on behalf of Pledgee and Pledgor.

(d)    THIS AGREEMENT SHALL BE GOVERNED BY, AND CON-STRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE.

15.    <u>Further Assurances; Pledgee May Perform</u>.

(a)    At Pledgor's expense, Pledgor will do all such acts, and will furnish to Pledgee all such financing statements, certificates, legal opinions and other documents and will do or cause to be done all such other things as Pledgee may reasonably request from time to time in order to give full effect to this Agreement and to secure the rights intended to be granted to Pledgee hereunder. To the extent permitted by applicable law, Pledgor hereby authorizes Pledgee to execute and file, in the name of Pledgor or otherwise, Uniform Commercial Code financing statements (which may be photocopies of this Agreement) which Pledgee in its sole discretion may deem necessary or appropriate.

(b)    If Pledgor fails to perform any act required by this Agreement, Pledgee may perform, or cause performance of, such act, and the expenses of Pledgee incurred in con-nection therewith shall be governed by Section 13 hereof.

16.    <u>Notices</u>. Except as otherwise provided herein, any notice required hereunder shall be in writing, and shall be deemed to have been validly served, given or

delivered upon receipt after transmittal by hand or by Federal Express or similar service, or five business days after deposit in the United States mails, registered first class mail, with proper postage prepaid, and addressed to the party to be notified at the following addresses (or such other address as such party shall designate in a notice delivered to the other party hereunder):

(a)     If to Pledgee, at

28 State Street
Suite 1100
Boston, Ma 02109

with copies to:

(b)     If to Pledgor, at

300 Boylston Street
Suite 608
Boston, Ma 02116

with copies to:

David Bacon
Amadeus Capital Corporation
35A Hazelton Avenue
Toronto, Ontario
M5R 2E3

Failure to comply with the provisions set forth above with respect to the delivery of copies shall not impair the validity of any notice otherwise complying with the terms hereof.

8

17.     Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

IN WITNESS WHEREOF, the parties hereto have caused this Stock Pledge Agreement to be duly executed as of the date first above written.

FIRST KNOWLEDGE PARTNERS INC.

By:     David Bacon
Title: Treasurer and Secretary

By:     David G. Robinson

9

**APPENDIX D**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (Eastern Division)

| | |
|---|---|
| In re: ) | Chapter 7 |
| ) | Case No. 02-16649 CJK |
| FIRST KNOWLEDGE PARTNERS, INC. ) | |
| ) | |
| Debtor. ) | |
| ) | |
| JOHN J. AQUINO, TRUSTEE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| AMADEUS CAPITAL CORPORATION, ) | |
| AMADEUS CAPITAL U.S. INC., ) | |
| MILES S. NADAL, ROBERT BALFOUR, ) | |
| GAVIN SWARTZMAN, TREVOR ) | Ad. Pro. No. 04-01288 |
| MAUNDER, DAVID G. ROBINSON, ) | |
| JAMES D. FISHER, DESZO HORVATH, ) | |
| DAVID C. KASSIE, DEAN C. KEHLER, ) | |
| ALLAN Z. LOREN, STEPHEN M. PUSTIL, ) | |
| THOMAS VOLPE, DEREK SMITH ) | |
| and MICHAEL SIMONETTA, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## DEFENDANT, DAVID G. ROBINSON'S,
## RESPONSIVE PLEADING, INCLUDING HIS ANSWER, AFFIRMATIVE
## DEFENSES, COUNTERCLAIMS AND CROSS-CLAIMS;

### AND

## ROBINSON'S OBJECTION TO THE BANKRUPTCY COURT'S "RELATED TO"
## JURISDICTION AND ITS ENTRY OF JUDGMENT ON COUNT XIII AND COUNT
## XVI, ALLEGING STATE COMMON LAW CLAIMS;

### AND

## ROBINSON'S DEMAND FOR A JURY TRIAL ON ALL ISSUES TRIABLE TO A JURY

Defendant, David G. Robinson ("Robinson"), hereby submits this Responsive Pleading, including his Answer, Affirmative Defenses, Counterclaims and Cross-Claims, to the Complaint filed by John J. Aquino, the Chapter 7 Trustee of the Debtor ("Trustee"), First Knowledge Partners, Inc. ("FKP"), in this Adversary Proceeding; Robinson objects to the Bankruptcy Court's exercise over Count XVI, alleging a state common law claim in tort for his breach of fiduciary duty to FKP and its creditors; and, Robinson demands a jury trial on all issues triable to a jury.

## INTRODUCTION

This case arises out of the Trustee's indiscriminate and over-reaching attempts to collect funds for the bankruptcy estate, regardless of the merits of his claims or the facts and circumstances causing First Knowledge Partners ("FKP") to file for bankruptcy. Indeed, contrary to the Trustee's allegations, FKP's bankruptcy did not arise out of any wrongful conduct on behalf of its corporate directors and/or officers. Rather, FKP's bankruptcy was caused by the unfortunate demise of the telecommunications industry and the economic disruption following the September 11, 2001, terrorist attacks on our nation, which no one, least of all the people working hardest to save FKP, could possibly have foreseen.

## I. ANSWER

Robinson by way of his Answer to the Complaint sets forth the following responses to every numbered paragraph in the Complaint.

1.    In this adversary proceeding, the Trustee seeks to recover certain cash assets arising from a series of transfers from the Debtor to its majority stockholder, Amadeus, its U.S. subsidiary, Amadeus U.S., and Amadeus's corporate officers and directors, which drained and siphoned off the cash assets of the Debtor for the benefit of Amadeus and its owners, directors and officers and to the detriment of the Debtor and its creditors. Specifically, the Trustee seeks to recover a series of payments by the Debtor to Amadeus and/or Amadeus U.S. which were engineered, implemented and/or approved by the former officers and directors of FKP whose allegiance was to the Debtor's majority stockholder, Amadeus, and its owners. The payments were allegedly made to Amadeus pursuant to a written management fee agreement, which, in fact, never existed. The payments were made to Amadeus for alleged management services performed by

2

Amadeus even though FKP employed a highly paid executive team to perform the same work. The alleged management services performed by Amadeus are unsupported and unsubstantiated by any written records. The transfers to Amadeus and its U.S. subsidiary, Amadeus U.S., were made at a time when the Debtor was insolvent or rendered the Debtor insolvent. The transfers at issue constituted fraudulent and/or preferential transfers, and are recoverable pursuant to the United States Bankruptcy Code ("Code") and applicable state law

1.    Robinson says that paragraph 1 requires no response, as it is replete with

speculative opinions; conclusions of law; and, summaries of allegations found elsewhere in the

Complaint (to which he has provided specific responses herein).  To the extent a separate

response may be required, Robinson says he is without knowledge or information sufficient to

form a belief as to what the Trustee is really seeking.

2.    In addition, the Trustee seeks to recover excessive salaries and "reimbursements" paid to one or more officers and directors of the Debtor made at a time when the Debtor was insolvent or rendered the Debtor insolvent and constituted fraudulent and/or preferential transfers.

2.    Robinson says that paragraph 2 requires no response, as it is replete with

speculative opinions; conclusions of law; and, summaries of allegations found elsewhere in the

Complaint (to which he has provided specific responses herein).  To the extent a separate

response may be required, Robinson says he is without knowledge or information sufficient to

form a belief as to what the Trustee is really seeking.

3.    In addition, the Trustee seeks the turnover of property of the Debtor's estate, in the form of debts owed by one or more of the defendants pursuant to promissory notes executed in favor of the Debtor.

3.    Robinson says that paragraph 3 requires no response, as it is replete with

speculative opinions; conclusions of law; and, summaries of allegations found elsewhere in the

Complaint (to which he has provided specific responses herein).  To the extent a separate

response may be required, Robinson says he is without knowledge or information sufficient to

form a belief as to what the Trustee is really seeking.

4.    In addition, the Trustee seeks damages from the former directors and officers of the Debtor who presided over the fraudulent transfers to the Debtor's majority shareholder and its officers and directors in breach of their fiduciary duties owed to the Debtor and its creditors.

4.    Robinson says that paragraph 4 requires no response, as it is replete with speculative opinions; conclusions of law; and, summaries of allegations found elsewhere in the Complaint (to which he has provided specific responses herein).  To the extent a separate response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to what the Trustee is really seeking.

5.    Finally, the Trustee seeks a declaratory judgment from this Court that the debtor's majority shareholder, Amadeus, and its U.S. subsidiary, Amadeus U.S., were alter egos of the Debtor, and that Amadeus and Amadeus U.S. should be collapsed so that the assets of Amadeus and Amadeus U.S. are made available to satisfy the claims of the Debtor's creditors.

5.    Robinson says that paragraph 5 requires no response, as it is replete with speculative opinions; conclusions of law; and, summaries of allegations found elsewhere in the Complaint (to which he has provided specific responses herein).  To the extent a separate response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to what the Trustee is really seeking.

## Jurisdiction and Venue

6.    Jurisdiction over this adversary proceeding is based on 28 U.S.C. §§ 151, 157, and 1334.

6.    Robinson says that Paragraph 6 states a legal conclusion, which does not require a response.  However, to the extent a response may be required, Robinson says that Count XIII and Count XVI set forth pre-petition non-core state law claims that are not adjudicable in the Bankruptcy Court, because the parties do not consent; and, that they are not adjudicable in the federal district court, because they lack a sufficient "nexus" with FKP's bankruptcy case.

7.    This is a "core" proceeding as that term is defined in 28 U.S.C. § 157(b)(2)(A), (E), (F), (H), and (0).

7.    Robinson says that Paragraph 7 states a legal conclusion, which does not require a response. However, to the extent a response may be required, Robinson denies that Count XIII and Count XVI are "core" proceedings, because they only allege pre-petition state common law claims for breach of contract and breach of fiduciary duty to FKP and its creditors.

8.    The District of Massachussetts is the proper venue for this adversary proceeding pursuant to 28 U.S.C. § 1409.

8.    Robinson says that Paragraph 8 states a legal conclusion, which does not require a response.

## Parties

9.    The Plaintiff, John J. Aquino, is the duly appointed and acting Trustee ("Trustee") of the Debtor.

9.    Robinson admits that the plaintiff, John J. Aquino, is the duly appointed and acting Trustee ("Trustee") of the Debtor, FKP.

10.    The Defendant, Amadeus, is, upon information and belief, an Ontario, Canada corporation with its usual place of business in Toronto, Ontario. Amadeus is the majority stockholder of the Debtor, owning approximately 70% of its shares. Amadeus is an insider of the Debtor.

10.    Robinson, upon information and belief, admits that the defendant, Amadeus, is an Ontario, Canada corporation with its usual place of business in Toronto, Ontario; and, that Amadeus is the majority stockholder of the Debtor, FKP, owning approximately 70% of its shares. However, Robinson says that the allegation as to "insider" is a legal conclusion, which does not require a response. Otherwise, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 10.

11.    The Defendant, Amadeus U.S., is, upon information and belief, a Delaware corporation, with its usual place of business in New York, New York.

5

Amadeus U.S. is a wholly owned subsidiary of Amadeus. Amadeus U.S. is an insider of the Debtor.

11.    Robinson, upon information and belief, admits that defendant, Amadeus U.S. is a Delaware corporation with a usual place of business in New York, New York. However, Robinson says that the allegation as to "insider" is a legal conclusion, which does not require a response. Otherwise, Robinson says that he is without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 11.

12.    The Defendant Miles S. Nadal ("Nadal") was, upon information and belief, at all material times the controlling shareholder of Amadeus with his usual place of business in Ontario, Canada. Nadal also served from its inception to its bankruptcy filing as the Chairman of the Board of Directors of FKP , and from July 30, 2002 forward, as the President and Chief Executive Officer of FKP. Nadal was also a shareholder of the Debtor. Nadal is an insider of the Debtor.

12.    Robinson, admits that Miles S. Nadal ("Nadal") served as the Chairman of the Board of Directors of FKP from its organization until as least May 29, 2002. However, Robinson says that the allegation as to "insider" is a legal conclusion, which does not require a response. Otherwise, Robinson says that he is without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 12.

13.    The Defendant Robert Balfour ("Balfour") was, upon information and belief, at all material times, a senior officer and director of Amadeus with his usual place of business in Ontario, Canada. Balfour served as FKP's Executive Vice President from its inception to its bankruptcy filing and was a shareholder of the Debtor. Balfour is an insider of the Debtor.

13.    Robinson admits that Balfour was a senior manager of FKP for a period of time through a portion of 2001. However, Robinson says that the allegation as to "insider" is a legal conclusion, which does not require a response. Otherwise, Robinson says that he is without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 13.

6

14.     The Defendant Gavin Swartzman ("Swartzman") was, upon information and belief, at all material times, a senior officer of Amadeus with his usual place of business in Ontario, Canada Swartzman served as FKP's Treasurer, Secretary and Chief Financial Officer from at the latest August 10, 2001 to its bankruptcy filing. Swartzman is an insider of the Debtor.

14.     Robinson, upon information and belief, admits that the defendant, Gavin

Swartzman ("Swartzman") served as FKP's Treasurer, Secretary and Chief Financial Officer

from at the latest August 10, 2001, until at least May 29, 2002. However, Robinson says that the

allegation as to "insider" is a legal conclusion which does not require a response. Otherwise,

Robinson says that he is without knowledge or information sufficient to form a belief as to the

truth of the remaining averments of paragraph 14.

15.     The Defendant Trevor Maunder ("Maunder") was, upon information and belief, at  all material times, a senior officer of Amadeus with his usual place of business in Ontario, Canada. Maunder served as FKP's Vice President from FKP's inception to its bankruptcy filing. Maunder is an insider of the Debtor.

15.     Robinson, upon information and belief, admits that Trevor Maunder ("Maunder")

served as FKP's Vice President from FKP's organization until at least May 29, 2002. However,

Robinson says that the allegation as to "insider" is a legal conclusion, which does not require a

response. Otherwise, Robinson says that he is without knowledge or information sufficient to

form a belief as to the truth of the remaining averments of paragraph 15.

16.     The Defendant, David G. Robinson ("Robinson"), was a Director and President and Chief Executive Officer of FKP from its inception to at least July 30,2002, and was a shareholder of the Debtor. Robinson's usual place of business is Suffolk County, Massachusetts. Robinson is an insider of the Debtor.

16.     Robinson admits that he was a Director and President and Chief Executive Officer

of FKP from January 2000 at least until May 29, 2002; that he was a shareholder of the Debtor,

FKP; and, that his residence is in Suffolk County, Massachusetts. However, Robinson says that

the allegation as to "insider" is a legal conclusion, which does not require a response. Otherwise,

7

Robinson says he is without knowledge or information sufficient to form a belief as to the truth

of the remaining averments of paragraph 16.

17.    The Defendant, James D. Fisher ("Fisher"), was Vice Chairman of the
Board of Directors of FKP from its inception to at least July 30,2002. Fisher's usual place
of business is Ontario, Canada Fisher is an insider of the Debtor.

17.    Robinson admits that James D. Fisher ("Fisher") was Vice Chairman of the Board

of Directors of FKP for a period of time, at least until May 29, 2002; and, that Fisher's usual

place of business was in Ontario, Canada. However, Robinson says that the allegation as to

"insider" is a legal conclusion, which does not require a response. Otherwise, Robinson says that

he is without knowledge or information sufficient to form a belief as to the truth of the remaining

averments of paragraph 17.

18.    The Defendant, Deszo Horvath, ("Horvath"), was a Director of FKP from
its inception to at least November 28, 2001. Horvath' s usual place of business is Ontario,
Canada. Horvath is an insider of the Debtor.

18.    Robinson admits that Deszo Horvath ("Horvath") was a Director of FKP for a

period of time until at least November 28, 2001; and that Horvath's usual place of business was

in Ontario, Canada. However, Robinson says that the allegation as to "insider" is a legal

conclusion, which does not require a response. Otherwise, Robinson says he is without

knowledge or information sufficient to form a belief as to the truth of the remaining averments of

paragraph 18.

19.    The Defendant, David C. Kassie ("Kassie"), was a Director of FKP from
its inception to at least May, 2001. Kassie's usual place of business is Ontario, Canada.
Kassie is an insider of the Debtor.

19.    Robinson denies that David C. Kassie ("Kassie") was a director of FKP.

Robinson admits that Kassie's usual place of business was in Ontario, Canada. However, ,

Robinson says that the allegation as to "insider" is a legal conclusion, which does not require a

8

response. Otherwise, Robinson says that he is without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 19.

    20.    The Defendant, Dean C. Kehler ("Kehler"), was a Director of FKP from its inception to at least May 200 I. Kehler's usual place of business is New York, New York. Kehler is an insider of the Debtor.

    20.    Robinson denies that Dean C. Kehler ("Kehler") was a director of FKP. Robinson admits that Kehler's usual place of business was New York, New York. However, Robinson says that the allegation as to "insider" is a legal conclusion, which does not require a response. Otherwise, Robinson says that he is without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 20.

    21.    The Defendant, Allan Z. Loren ("Loren "), was a Director of FKP from its inception to at least December 2001. Loren's usual place of business is Murray Hill, New Jersey. Loren is an insider of the Debtor.

    21.    Robinson admits that Allan Z. Loren ("Loren") was a Director of FKP from at least May 24, 2000, until at least November 21, 2001. However, Robinson says that the allegation as to "insider" is a legal conclusion, which does not require a response. Otherwise, Robinson says that he is without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 21.

    22.    The Defendant, Stephen M. Pustil ("Pustil"), was a Director of FKP from its inception to its bankruptcy filing. Pustil's usual place of business is Ontario, Canada. Pustil is an insider of the Debtor.

    22.    Robinson admits that Stephen M. Pustil ("Pustil") was a Director of FKP for a period of time until at least May 29, 2002; and, his usual place of business is Ontario, Canada. However, Robinson says that the allegation as to "insider" is a legal conclusion, which does not require a response. Otherwise, Robinson says that he is without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 22.

23.    The Defendant, Thomas Volpe ("Volpe"), was a Director of FKP from its inception to at least August 2002. Volpe's usual place of business is New York, New York. Volpe is an insider of the Debtor.

23.    Robinson admits that the defendant, Thomas Volpe ("Volpe") was a Director of

FKP for a period of time until at least May 29, 2002. However, Robinson says that the allegation

as to "insider" is a legal conclusion, which does not require a response. Otherwise, Robinson

says that he is without knowledge or information sufficient to form a belief as to the truth of the

remaining averments in paragraph 23.

24.    The Defendant, Derek Smith ("Smith"), was the Chief Financial Officer of FKP from July 2000 to July 2001. Smith's usual place of business is Massachusetts. Smith is an insider of the Debtor.

24.    Robinson admits that Derek Smith ("Smith") was the Chief Financial Officer of

FKP from at least September 2000 to July 2001. However, Robinson says that the allegation as

to "insider" is a legal conclusion, which does not require a response. Otherwise, Robinson says

that he is without knowledge or information sufficient to form a belief as to the truth of the

remaining averments in paragraph 24.

25.    The Defendant, Michael Simonetta ("Simonetta"), was an officer of Amadeus. Simonetta' s usual place of business is Ontario, Canada. Simonetta was a shareholder of the Debtor. Simonetta is an insider of the Debtor.

25.    Robinson says that the allegation as to "insider" is a legal conclusion, which does

not require a response. Otherwise, Robinson says that he is without knowledge or information

sufficient to form a belief as to the truth of the remaining averments in paragraph 25.

### General Allegations of Fact

26.    On September 16, 2002 ("Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under Chapter 7 of the Code. Thereafter, the Trustee was appointed over the Debtor's estate by the United States Trustee for the District of Massachusetts and the Trustee continues to serve in that capacity .

26.    Robinson admits that on September 16, 2002 ("Petition Date") the Debtor, FKP, commenced this case by filing a voluntary petition for relief under Chapter 7 of the Code; that thereafter, the Trustee was appointed over the Debtor's, FKP's, estate by the United States Trustee for the District of Massachusetts; and that the Trustee continues to serve in that capacity.

27.    Prior to its cessation of business on the Petition Date, the Debtor, according to its audited financial statements for year ending December 31, 2000, was in the business of providing management consulting services focused on strategy, operations, organization and culture, and information technology consulting to high-growth organizations competing in the digital economy

27.    Robinson admits that prior to its cessation of business on the Petition Date, the Debtor, according to its audited financial statements for year ending December 31, 2000, was in the business of providing management consulting services focused on strategy, operations, organization and culture, and information technology consulting to high-growth organizations competing in the digital economy.

28.    The Debtor was formed in 1999 and later incorporated on December 20,1999. Its two shareholders were Amadeus and CIBC WMV , Inc., with Amadeus holding the majority (approximately 70%) interest. The Debtor's principal offices were located in Boston, Massachusetts.

28.    Robinson admits that the Debtor, FKP, was formed in 1999 and later incorporated in the State of Delaware; that its two shareholders were Amadeus and CIBC Capital Corporation, with Amadeus holding the majority (voting ____) interest; and, that the Debtor's, FKP's, principal offices were located in Boston, Massachusetts.

### Transfers to Amadeus and Amadeus U.S.

29.    From its formation in 1999, Amadeus, by means of its controlling interest in FKP, and through FKP's officers and directors who were also employees, officers, directors, and/or owners of Amadeus, and/or whose allegiances were to Amadeus and not FKP , caused FKP to transfer significant cash amounts to it and/or its U.S. subsidiary , Amadeus U.S., under the pretext that such transfers were in consideration for "management and consulting fees" or for the payment of "operating costs " or "reimbursement of expenses. "

29.     Robinson says he is without knowledge or information sufficient to form a belief as to the "cause" of the FKP/Amadeus management fee arrangement, as he was not involved with FKP as a director, officer or employee at the time the arrangement was made between FKP and Amadeus, FKP's majority shareholder.  Robinson denies that FKP's Directors and Officers made the FKP/Amadeus management fee arrangement, as such arrangement was made by and between, and duly approved by, FKP's shareholders acting in good faith, pursuant to Delaware general corporation law, Title 8, § 144(2).  Further, Robinson denies that FKP paid any management fees under any "pretext."  Rather, Robinson says that all such management fees were paid for services and/or benefits that Amadeus provided to FKP.

30.     In 1999, FKP transferred $944,714 to Amadeus allegedly for the "reimbursement of operating costs and management fees" (the "1999 Payments").

30.     Robinson says that he lacks sufficient knowledge of information to form a belief as to the specific date or the actual amount that FKP transferred to Amadeus.  However, Robinson admits that any such payment was made for the "reimbursement of operating costs and management fees" (the "1999 Payments').

31.     In December 2000, FKP transferred $500,000 to Amadeus allegedly for management services (the "December 2000 Payment").

31.     Robinson says that he lacks sufficient knowledge or information to form a belief as to the specific date or the actual amount that FKP transferred to Amadeus.  However, Robinson admits that any such payment was made for the "reimbursement of operating costs and management fees" (the "2000 Payments').

32.     On January 8, 2001, the Debtor transferred $1,000,000 to Amadeus (the "January 2001 Payment") in the form of a check signed by defendants Balfour and Maunder. The January 2001 payment was made pursuant to an "invoice" from Amadeus in which Amadeus requested 'an advance of $1,000,000 U.S. for our transaction advisory and M&A support services on behalf of Miles S. Nadal." The "invoice" stated that the

request was made pursuant to a "Management Services Agreement" between Amadeus and FKP. No such agreement existed between the parties. No agreement existed which permitted or entitled Amadeus to an "advance' for future services to be rendered. No documentation exists to support whether in fact Amadeus ever performed such services for which the "advance" of $1,000,000 was made.

32.    Robinson says that he lacks sufficient knowledge or information to form a belief as to the specific date or the actual amount that FKP transferred to Amadeus. However, Robinson admits that any such payment was made for the "reimbursement of operating costs and management fees" (the "January 2001 Payment"). Otherwise, Robinson denies the remaining averments in paragraph 32. Finally, Robinson says that he does not know the content of the documents referred to in paragraph 32, as all such documents are in the possession of the Trustees.

33.    On February 14,2001 FKP transferred $110,000 to Amadeus allegedly for management services ("February 2001 Payment") in the form of a check signed by defendants Swartzman and Maunder.

33.    Robinson says that he lacks sufficient knowledge or information to form a belief as to the specific date or the actual amount that FKP transferred to Amadeus. However, Robinson says that any such payment was made for the "reimbursement of operating costs and management fees" (the "February 2001 Payment"). Finally, Robinson says that he does not know the content of any documents referred to in paragraph 33, as all such documents are in the possession of the Trustee.

34.    On March 15,2001, FKP transferred $21,000 ("First March Payment") to Amadeus allegedly for management services in the form of a check signed by defendants Maunder and Balfour.

34.    Robinson says that he lacks sufficient knowledge or information to form a belief as to the specific date or the actual amount that FKP transferred to Amadeus. However, Robinson admits that any such payment was made for the "reimbursement of operating costs and

13

management fees" ("First March Payment"). Finally, Robinson says that he does not know the

content of any documents referred to in paragraph 34, as all such documents are in the

possession of the Trustee.

35.    On March 26,2001, FKP transferred $90,300 ("Second March 2001 Payment") to Amadeus allegedly for management services in the form of a check signed by defendants Maunder and Swartzman.

35.    Robinson says that he lacks sufficient knowledge or information to form a belief

as to the specific date or the actual amount that FKP transferred to Amadeus. However,

Robinson admits that any such payment was made for the "reimbursement of operating costs and

management fees" ("Second March 2001 Payment"). Finally, Robinson says that he does not

know the content of any documents referred to in paragraph 35, as all such documents are in the

possession of the Trustee.

36.    On April 18, 2001, FKP transferred $201,000 ("April 2001 Payment") to Amadeus allegedly for management services in the form of a check signed by defendants Swartzman and Smith.

36.    Robinson says that he lacks sufficient knowledge or information to form a belief

as to the specific date or the actual amount that FKP transferred to Amadeus. However,

Robinson admits that any such payment was made for the "reimbursement of operating costs and

management fees" ("April 2001 Payment"). Finally, Robinson says that he does not know the

content of any documents referred to in paragraph 36, as all such documents are in the

possession of the Trustee.

37.    On August 20,2001, FKP transferred $202,500 ("August 2001 Payment") to Amadeus allegedly for management services in the form of a check signed by defendants Maunder and Swartzman.

37.    Robinson says that he lacks sufficient knowledge or information to form a belief

as to the specific date or the actual amount that FKP transferred to Amadeus. However,

Robinson admits that any such payment was made for the "reimbursement of operating costs and management fees" ("August 2001 Payment"). Finally, Robinson says that he does not know the content of any documents referred to in paragraph 37, as all such documents are in the possession of the Trustee.

38.    On October 18,2001, FKP transferred $225,000 ("October 2001 Payment") to Amadeus allegedly for management services in the form of a check signed by defendants Maunder and Swartzman.

38.    Robinson says that he lacks sufficient knowledge or information to form a belief as to the specific date or the actual amount that FKP transferred to Amadeus. However, Robinson admits that any such payment was made for the "reimbursement of operating costs and management fees" ("October 2001 Payment"). Finally, Robinson says that he does not know the content of any documents referred to in paragraph 38, as all such documents are in the possession of the Trustee.

39.    On January 16,2002, FKP transferred $225,000 ("January 2002 Payment") to Amadeus allegedly for management services.

39.    Robinson says that he lacks sufficient knowledge or information to form a belief as to the specific date or the actual amount that FKP transferred to Amadeus. However, Robinson admits that any such payment was made for the "reimbursement of operating costs and management fees" ("January 2002 Payment"). Finally, Robinson says that he does not know the content of any documents referred to in paragraph 39, as all such documents are in the possession of the Trustee.

40.    On February 28,2002, FKP transferred $650,000 (the "Amadeus U.S. Payment") to Amadeus U.S., allegedly for management services. Of this amount, $500,000 was paid through a wire transfer authorized by defendants Maunder and Swartzman.

40.    Robinson says that he lacks sufficient knowledge or information to form a belief as to the specific date or the actual amount that FKP transferred to Amadeus. However, Robinson admits that any such payment was made for the "reimbursement of operating costs and management fees" (the "Amadeus U.S. Payment"). Finally, Robinson says that he does not know the content of any documents referred to in paragraph 40, as all such documents are in the possession of the Trustee.

41.    On April 4, 2002, FKP transferred $125,000 ("April 2002 Payment") to Amadeus allegedly for management services.

41.    Robinson says that he lacks sufficient knowledge or information to form a belief as to the specific date or the actual amount that FKP transferred to Amadeus. However, Robinson admits that that any such payment was made for the "reimbursement of operating costs and management fees" ("April 2002 Payment"). Finally, Robinson says that he does not know the content of any documents referred to in paragraph 41, as all such documents are in the possession of the Trustee.

42.    The 1999 Payments, January 2001 Payment, February 2001 Payment, First March 2001 Payment, Second March 2001 Payment, April 2001 Payment, August 2001 Payment, October 2001 Payment, January 2002 Payment and April 2002 Payment are sometimes collectively referred to herein as the "Amadeus Payments." The October 2001 Payment, January 2002 Payment and April 2002 Payment are sometimes collectively referred to herein as the "Amadeus Preference Period Payments."

42.    Robinson admits that the Complaint refers to the 1999 Payments, January 2001 Payment, February 2001 Payment, First March 2001 Payment, Second March 2001 Payment, April 2001 Payment, August 2001 Payment, October 2001 Payment, January 2002 Payment and April 2002 Payment as the "Amadeus Payments"; and, that it refers to the October 2001 Payment, January 2002 Payment and April 2002 Payment as the "Amadeus Preference Period Payments."

16

43.    Upon information and belief, in consideration for the Amadeus Payments and the Amadeus U.S. Payment, little or no "management services" were performed by Amadeus or its U.S. subsidiary as a distinct and separate entity as opposed to services performed by officers, directors, and/or employees of Amadeus who were also officers, directors and/or employees of the Debtor. The fees were excessive, not based on an arms length negotiation or market value, and disproportionate to any such services which were provided.

43.    Robinson says that the averments in paragraph 43 are unintelligible, as

individuals, rather than corporate entities, actually perform personal services; so he is not able to

formulate an appropriate response. However, to the extent a separate response may be required,

Robinson denies the averments of paragraph 44.

44.    Upon information and belief, no independent evaluation or determination was made by the officers and directors of the Debtor to determine whether the Amadeus Payments and the Amadeus U.S. Payment were in consideration for actual services or expenses independently incurred by Amadeus on behalf of the Debtor, whether the services or expenses, to the extent that they were performed or incurred, were necessary for the business operations of the Debtor, or that the fees and expenses charged represent the fair market value price that would be charged by a similar firm in the industry

44.    Robinson denies the averments in paragraph 44.

45.    No written agreement exists between the parties which sets forth the terms and conditions under which Amadeus is to perform management services, including the fees for such services. To the extent that the Amadeus Payments and Amadeus U.S. Payment were made allegedly for the reimbursement of expenses, no supporting documentation was provided to the Debtor evidencing such expenses.

45.    Robinson says that he lacks sufficient knowledge of information to form a belief

as to the truth of the averments in paragraph 45.

**Transfers to Officers and Directors**

46.    During 2001, the Debtor transferred to Robinson payments allegedly as salary in the amount of $690,000 (the "Robinson Payments"). Within one year of the Petition Date, the Debtor transferred to Robinson payments of $265,080.68 allegedly in salary and $65,080.68 allegedly in expenses (the "Robinson Preference Period Payments").

46.    Robinson admits that during 2001, the Debtor, FKP, transferred to Robinson payments of salary and bonus in the amount of $692,849 (the "Robinson Payments"); and, within one year of the Petition Date, the Debtor, FKP, transferred to him payments of salary in the amount of $264,731 and reimbursement for FKP expenses in the amount of $54,453 (allegedly the "Robinson Preference Period Payments"). Otherwise, Robinson denies knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 46.

47.    During 2001, the Debtor transferred to Smith payments allegedly as salary in the amount of $240,000 and payments allegedly as reimbursements in the amount of $233,000 (the "Smith Payments"). Within one year of the Petition Date, the Debtor transferred to Smith payments of $110,155.28 in alleged salary, and $125,000 for the alleged repurchase of stock ($62,500 of which was characterized by the Debtor through its former officers and directors as an application against a non-interest bearing loan by Smith to the Debtor) ("Smith Preference Period Payments").

47.    Robinson says that he lacks sufficient knowledge of information to form a belief as to the truth of the averments of paragraph 47.

48.    Within one year of the Petition Date, the Debtor transferred to Balfour payments of $4,167, $5,055.35, and $4167 allegedly for consulting fees (the "Balfour Preference Period Payments").

48.    Robinson says that he lacks sufficient knowledge of information to form a belief as to the truth of the averments of paragraph 48.

49.    Within one year of the Petition Date, the Debtor transferred to Volpe payments of $1,139.11 and $10,000 allegedly for director fees and expenses (the "Volpe Preference Period Payments").

49.    Robinson says that he lacks sufficient knowledge of information to form a belief as to the truth of the averments of paragraph 49.

## Loans to Defendants Evidenced By Promissory Notes

50.    On March 23, 2000, in connection with Balfour's purchase of shares of the Debtor's stock, Balfour executed and delivered to the Debtor a Promissory Note (the "Balfour Note") in the original principal amount of $50,000.

18

50.    Robinson admits the existence of a loan to Balfour, but says he lacks sufficient

knowledge of information to form a belief as to the truth of the actual amount and/or date of such

loan.

51.    On May 12, 2000, in connection with Nadal's purchase of shares of the
Debtor's stock, Nadal executed and delivered to the Debtor a Demand Promissory Note
(the "Nadal Note") in the original principal amount of $500,000.

51.    Robinson admits the existence of a loan to Nadal, but says he lacks sufficient

knowledge of information to form a belief as to the truth of the actual amount and/or date of such

loan.

52.    On March 13, 2000, in connection with Robinson's purchase of shares of
the Debtor's stock, Robinson executed and delivered to the Debtor a Promissory Note
(the "Robinson Note") in the original principal amount of $250,000.

52.    Robinson admits that on March 13, 2000, in connection with his own purchase of

shares of the Debtor's, FKP's, stock, he executed and delivered to the Debtor, FKP, a Promissory

Note (the "Robinson Note") in the original principal amount of $250,000.

53.    On March 23, 2000, in connection with Simonetta's purchase of shares of
the Debtor's stock, Simonetta executed and delivered to the Debtor a Promissory Note
(the "Simonetta Note") in the original principal amount of $150,000.

53.    Robinson admits the existence of a loan to Simonetta, but says he lacks sufficient

knowledge of information to form a belief as to the truth of the actual amount and/or date of such

loan.

54.    On October 31, 2000, in connection with Smith's purchase of shares of the
Debtor, Smith executed and delivered to the Debtor a Promissory Note (the "Smith
Note") in the original principal amount of $62,500.

54.    Robinson admits the existence of a loan to Smith, but says he lacks sufficient

knowledge of information to form a belief as to the truth of the actual amount and/or date of such

loan.

19

## COUNT I
### Preferential Transfers pursuant to 11 U.S.C. § 547 vs. Amadeus)

55. The Trustee repeats and realleges Paragraphs 1 through 54, inclusive, and by reference incorporates them herein and makes them a part of this claim.

55.    Robinson repeats and realleges his responses to paragraphs 1 through 54,

inclusive, as if they were fully set forth in response to paragraph 55.

56.    The Amadeus Preference Period Payments constituted transfers of an interest of the Debtor in property.

56.    Robinson says that Paragraph 56 states a legal conclusion, which does not require

a response.  However, to the extent a response may be required, Robinson says he is without

knowledge or information sufficient to form a belief as to the truth of the averments of paragraph

56.

57.    The Amadeus Preference Period Payments were made to or for the benefit of Amadeus.

57.    Robinson says that the allegation as to "benefit" states a legal conclusion, which

does not require a response.

58.    Assuming for the purposes of this Count only that the Amadeus Preference Period Payments were made on account of management and other fees, each of the Amadeus Preference Period Payments was made for or on account of antecedent debt owed by the Debtor, before each of the Amadeus Preference Period Payments were made.

58.    Robinson says that Paragraph 58 states a legal conclusion, which does not require

a response.  However, to the extent a response may be required, Robinson says that he is without

knowledge or information sufficient to form a belief as to the truth of the averments of paragraph

58.

59.    Each of the Amadeus Preference Period Payments was made while the Debtor was insolvent.

59.    Robinson denies that each of the Amadeus Preference Period Payments was made while the Debtor, FKP, was insolvent.

60.    Each of the Amadeus Preference Period Payments enabled Amadeus to receive more than it would have received if the Debtor's case were a case under Chapter 7 of the Code, the transfer had not been made, and Amadeus received payment of such debt to the extent provided by the Code.

60.    Robinson denies the averments of paragraph 60.

61.    Each of the Amadeus Preference Period Payments is an avoidable preference pursuant to 11 U.S.C. § 547 and, pursuant to 11 U.S.C. § 550, the Debtor's estate is entitled to recover from Amadeus at least the full amount of the payments, plus interest thereon.

61.    Robinson denies the averments of paragraph 61.

### COUNT II
### (Preferential Transfers Pursuant to 11 U.S.C. § 547 vs. Amadeus U.S.)

62.    The Trustee repeats and realleges Paragraphs 1 through 61, inclusive, and by reference incorporates them herein and makes them a part of this claim.

62.    Robinson repeats and realleges his responses to paragraphs 1 through 61, inclusive, as if they were fully set forth in response to paragraph 62.

63.    The Amadeus U.S. Payment constituted a transfer of an interest of the Debtor in property.

63.    Robinson says that Paragraph 63 states a legal conclusion which does not require a response.  However, to the extent a response may be required, Robinson says that he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 63.

64.    The Amadeus U.S. Payment was made to or for the benefit of Amadeus U.S.

64.    Robinson says that the allegation as to "benefit" states a legal conclusion, which does not require a response.

21

65.    Assuming for the purposes of this Court only that the Amadeus U.S. Payment was made on account of management and other fees, the Amadeus U.S. Payment was made for or on account of antecedent debt owed by the Debtor before the Amadeus U.S. Payment was made.

65.    Robinson says that Paragraph 65 states a legal conclusion which does not require a response. However, to the extent a response may be required, Robinson says that he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 65.

66.    The Amadeus U.S. Payment was made while the Debtor was insolvent.

66.    Robinson denies that the Amadeus U.S. Payment was made while the Debtor, FKP, was insolvent.

67.    The Amadeus U.S. Payment enabled Amadeus U.S. to receive more than it would have received if the Debtor's case were a case under Chapter 7 of the Code, the transfer had not been made, and Amadeus U.S. received payment of such debt to the extent provided by the Code.

67.    Robinson denies the averments of paragraph 67.

68.    The Amadeus U.S. Payment is an avoidable preference pursuant to U.S.C. § 547 and, pursuant to 11 U.S.C. § 550, the Debtor's estate is entitled to recover from Amadeus U.S. at least the full amount of the payment, plus interest thereon.

68.    Robinson denies the averments of paragraph 68.

## COUNT III
### (Fraudulent Transfers pursuant to 11 U.S.C. § 548 vs. Amadeus)

69.    The Trustee repeats and realleges Paragraphs 1 through 68, inclusive, and by reference incorporates them herein and makes them a part of this claim.

69.    Robinson repeats and realleges his responses to paragraphs 1 through 68, inclusive, as if they were fully set forth in response to paragraph 69.

70.    The Amadeus Preference Period Payments were made by the Debtor on or within one year prior to the Petition Date.

70.    Robinson says he lacks sufficient knowledge or information to form a belief as to specific dates of the alleged Amadeus Preference Period Payments.

71.    The Amadeus Preference Period Payments were transfers of interests of the Debtor in property.

71.    Robinson says that Paragraph 71 states a legal conclusion, which does not require a response. To the extent a response may be required, defendant is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 71.

72.    The Debtor received less than a reasonably equivalent value in exchange for the Amadeus Preference Period Payments.

72.    Robinson denies that the Debtor, FKP, received less than a reasonably equivalent value in exchange for the alleged Amadeus Preference Period Payments.

73.    The Debtor was insolvent on the dates that the Amadeus Preference Period Payments were made, or was rendered insolvent by the Amadeus Preference Period Payments.

73.    Robinson denies that the Debtor, FKP, was insolvent on the dates that the Amadeus Preference Period Payments were made; and he denies that FKP was rendered insolvent by the alleged Amadeus Preference Period Payments.

74.    The Amadeus Preference Period Payments are avoidable as fraudulent transfers under 11 U.S.C. § 548, and, pursuant to 11 U.S.C. § 550, the Debtor's estate is entitled to recover from Amadeus the amount of the Amadeus Preference Period Payments and any further amounts which this Court determines to be fraudulently transferred for the benefit of the Debtor's bankruptcy estate.

74.    Robinson says that Paragraph 74 states a legal conclusion, which does not require a response. However, to the extent a response may be required, Robinson says that he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 74.

**COUNT IV**
**(Fraudulent Transfers pursuant to 11 U.S.C. § 548 vs. Amadeus U.S.)**

75.    The Trustee repeats and realleges Paragraphs 1 through 74 inclusive, and by reference incorporates them herein and makes them a part of this claim.

75.    Robinson repeats and realleges his responses to paragraphs 1 through 74, inclusive, as if they were fully set forth in response to paragraph 75.

76.    The Amadeus U.S. Payment was made by the Debtor on or within one year prior to the Petition Date.

76.    Robinson says he lacks sufficient knowledge or information to form a belief as to the specific dates of the Amadeus U.S. Payment.

77.    The Amadeus U. S. Payment was a transfer of interests of the Debtor in property

77.    Robinson says that Paragraph 77 states a legal conclusion, which does not require a response. However, to the extent a response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 77.

78.    The Debtor received less than a reasonably equivalent value in exchange for the Amadeus U.S. Payment.

78.    Robinson denies that the Debtor, FKP, received less than a reasonably equivalent value in exchange for the Amadeus U.S. Payment.

79.    The Debtor was insolvent on the dates that the Amadeus U.S. Payment was made, or was rendered insolvent by the Amadeus U.S. Payment.

79.    Robinson denies the averments of Paragraph 79.

80.    The Amadeus Preference Period Transfers are avoidable as fraudulent transfers under U.S.C. § 548, and, pursuant to 11 U.S.C. § 550, the Trustee is entitled to recover from Amadeus U.S. the amount of the Amadeus U.S. Payment and any further amounts which this Court determines to be fraudulently transferred for the benefit of the Debtor's bankruptcy estate.

80.    Robinson denies the averments of Paragraph 80.

24

## COUNT V
### (Fraudulent Transfers Pursuant to 11 U.S.C. § 544-Mass. Gen. Laws Ch. 109A, § 5 vs. Amadeus)

81.    The Trustee repeats and realleges Paragraphs 1 through 80, inclusive, and by reference incorporates them herein and makes them a part of this claim.

81.    Robinson repeats and realleges his responses to paragraphs 1 through 80,

inclusive, as if they were fully set forth in response to paragraph 81.

82.    The Amadeus Payments were made without the Debtor receiving reasonably equivalent value in exchange for said transfers.

82.    Robinson denies that the Amadeus Payments were made without the Debtor,

FKP, receiving reasonably equivalent value in exchange for said transfers.

83.    At the time of the Amadeus Payments, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

83.    Robinson denies the averments of paragraph 83.

84.    At the time of the Amadeus Payments, the Debtor incurred, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

84.    Robinson denies that at the time of the Amadeus Payments, the Debtor incurred,

or believed or reasonably should have believed that it would incur debts beyond its ability to pay

as they became due.

85.    The Amadeus Payments are avoidable as fraudulent transfers under U.S.C. §544(b) and Mass. Gen. Laws Ch. 109A, § 5, and pursuant to 11 U.S.C. § 550, the Trustee is entitled to recover from Amadeus the amount of the Amadeus Payments and any further amounts which this Court determines to be fraudulently transferred for the benefit of the Debtor's bankruptcy estate.

85.    Robinson denies the averments of paragraph 85.

## COUNT VI
### (Fraudulent Transfers Pursuant to 11 U.S.C. § 544-Mass. Gen. Laws Ch. 109A, § 6 vs. Amadeus

86.    The Trustee repeats and realleges Paragraphs through 85 inclusive, and by reference incorporates them herein and makes them a part of this claim.

86.    Robinson repeats and realleges his responses to paragraphs 1 through 85, inclusive, as if they were fully set forth in response to paragraph 86.

87.    The Amadeus Payments were made without the Debtor receiving reasonably equivalent value in exchange for said transfers.

87.    Robinson denies that the Amadeus Payments were made without the Debtor receiving reasonably equivalent value in exchange for said transfers.

88.    At the time of the Amadeus Payments, the Debtor was insolvent or the Debtor became insolvent as a result of said transfers.

88.    Robinson denies that at the time of the Amadeus Payments, the Debtor, FKP, was insolvent; and he denies that the Debtor, FKP, became insolvent as a result of said transfers.

89.    If the Amadeus Payments were made for an antecedent debt, Amadeus had reasonable cause to believe that the Debtor was insolvent at the time of the Amadeus Payments.

89.    Robinson denies that if the Amadeus Payments were made for an antecedent debt, Amadeus had reasonable cause to believe that the Debtor was insolvent at the time of the Amadeus Payments, as "insolvent" is defined in paragraph 130.

90.    The Amadeus Payments are avoidable as fraudulent transfers under 11 U.S.C. §544 and Mass. Gen. Laws ch. 109A, § 6, and pursuant to 1 U.S.C. § 550, the Trustee is entitled to recover from Amadeus the amount of Amadeus and any further amounts which this court determines to be fraudulently transferred for the benefit of the Debtor's bankruptcy estate.

90.    Robinson denies the averments of paragraph 90.

### COUNT VII
### (Preferential Transfers pursuant to 11 U.S.C. § 547 vs. Robinson, Smith, Balfour and Volpe)

91.    The Trustee repeats and realleges Paragraphs 1 through 90, inclusive, and by reference incorporates them herein and makes them a part of this claim.

91.    Robinson repeats and realleges his responses to paragraphs 1 through 90,

inclusive, as if they were fully set forth in response to paragraph 91.

92.    The Robinson, Smith, Balfour and Volpe Preference Period Payments
constituted transfers of an interest of the Debtor in property

92.    Robinson says that Paragraph 92 states a legal conclusion, which does not require

a response.  However, to the extent a response may be required, Robinson says he is without

knowledge or information sufficient to form a belief as to the truth of the averments of paragraph

92.


93.    The Robinson, Smith, Balfour and Volpe Preference Period Payments were made
to or for the benefit of Robinson, Smith, Balfour and Volpe, respectively.

93.    Robinson admits that he received payments, which are allegedly referred to as

Preference Period Payments.  Otherwise, Robinson says he is without knowledge or information

sufficient to form a belief as to the truth of the averments that Smith, Balfour and Volpe received

payments allegedly referred to as Preference Period Payments.

94.    Each of the Robinson. Smith, Balfour and Volpe Preference Period
Payments was made for or on account of an antecedent debt owed by the Debtor before
each of the Preference Period Payments were made.

94.    Robinson says that Paragraph 94 states a legal conclusion, which does not require

a response.  However, to the extent a response may be required, defendant is without knowledge

or information sufficient to form a belief as to the truth of the averments of paragraph 94.

95.    Each of the Robinson, Smith, Balfour and Volpe Preference Period
Payments was made while the Debtor was insolvent.

95.    Robinson denies that each of the Robinson, Smith, Balfour and Volpe Preference

Period Payments was made while the debtor was insolvent.

96.    Each of the Robinson, Smith, Balfour and Volpe Preference Period
Payments enabled Robinson, Smith, Balfour and Volpe more than they would have

received if the Debtor's case were a case under Chapter 7 of the Code, the transfer had not been made, and Robinson, Smith, Balfour and Volpe received payment of such debt to the extent provided by the Code.

96.    Robinson denies the averments in paragraph 96.

97.    Each of the Robinson, Smith, Balfour and Volpe Preference Period Payments is an avoidable preference pursuant to U.S.C. § 547 and, pursuant to U.S.C. § 550, the Debtor's estate is entitled to recover from Robinson, Smith, Balfour and Volpe at least the full amount of the payments, plus interest thereon.

97.    Robinson denies the averments of paragraph 97.

## COUNT VIII
### (Fraudulent Transfers pursuant to 11 U.S.C. § 548 vs. Robinson, Smith, Balfour and Volpe)

98.    The Trustee repeats and realleges Paragraphs 1 through 97, inclusive, and by reference incorporates them herein and makes them a part of this claim.

98.    Robinson repeats and realleges his responses to paragraphs 1 through 97,

inclusive, as if they were fully set forth in response to paragraph 98.

99.    The Robinson, Smith, Balfour and Volpe Preference Period Payments were made by the Debtor on or within one year prior to the Petition Date.

99.    Robinson admits that he received $264,731 in salary and $54,453 in expense

reimbursement, as set forth in his response to paragraph 46, within one year of the Petition Date.

However, Robinson says he is without knowledge or information sufficient to form a belief as to

the truth of the averments that Smith, Balfour and Volpe Preference Period payments were made

by the Debtor on or within one year prior to the Petition Date.

100.    The Robinson, Smith, Balfour and Volpe Preference Period Payments were transfers of interests of the Debtor in property.

100.    Robinson says that Paragraph 100 states a legal conclusion, which does not

require a response.  However, to the extent a response may be required, Robinson says he is

28

without knowledge or information sufficient to form a belief as to the truth of the averments of

paragraph 100.

101.    The Debtor received less than a reasonably equivalent value in exchange
for the Robinson, Smith, Balfour and Volpe Preference Period Payments.

101.    Robinson denies that the Debtor, FKP, received less than a reasonably equivalent

value in exchange for the Robinson, Smith, Balfour and Volpe Preference Period Payments.

102.    The Debtor was insolvent on the dates that the Robinson, Smith, Balfour
and Volpe Preference Period Payments were made, or was rendered insolvent by the
Robinson, Smith, Balfour and Volpe Preference Period Payments.

102.    Robinson denies that the Debtor, FKP, was insolvent on the dates that Robinson,

Smith, Balfour and Volpe Preference Period Payments were made, or was rendered insolvent by

the Robinson, Smith, Balfour and Volpe Preference Period Payments.

103.    The Robinson, Smith, Balfour and Volpe Preference Period Payments are
avoidable transfers under 11 U.S.C. § 548, and pursuant to 11 U.S.C. § 550, the Debtor's
estate is entitled to recover from Robinson, Smith, Balfour and Volpe the amount of the
Robinson, Smith, Balfour and Volpe Preference Period Payments and any further
amounts which this Court determines to be fraudulently transferred for the benefit of the
Debtor's bankruptcy estate.

103.    Robinson denies the averments of paragraph 103.

## COUNT IX
### (Fraudulent Transfers Pursuant to 11 U.S.C. § 544-Mass. Gen. Laws ch. 109, § 5 vs. Robinson and Smith)

104.    The Trustee repeats and realleges Paragraphs through 103, inclusive, and
by reference incorporates them herein and makes them a part of this claim.

104.    Robinson repeats and realleges his responses to paragraphs 1 through 103,

inclusive, as if they were fully set forth in response to paragraph 104.

105.    The Robinson and Smith Payments were made without the Debtor
receiving reasonably equivalent value in exchange for said transfers.

105.    Robinson denies that the Robison and Smith Payments were made without the

Debtor, FKP, receiving reasonably equivalent value in exchange for said transfers.

106.    At the time of the Robinson and Smith Payments, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction.

106.    Robinson denies the averments of paragraph 106.

107.    At the time of the Robinson and Smith Payments, the Debtor incurred, or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

107.    Robinson denies that at the time of the Robinson and Smith Payments, the Debtor,

FKP, incurred, or believed or reasonably should have believed that it would incur debts beyond

its ability to pay as they became due.

108.    The Robinson and Smith Payments are avoidable as fraudulent transfers under II U.S.C. § 544(b) and Mass. Gen. Laws Ch. 109A, § 5, and pursuant to 11 U.S.C. § 550, the Trustee is entitled to recover from Robinson and Smith the amount of the Robinson and Smith Payments and any further amounts which this Court determines to be fraudulently transferred for the benefit of the Debtor's bankruptcy estate.

108.    Robinson denies the averments of paragraph 108.

### COUNT X
### (Fraudulent Transfers Pursuant to 11 U.S.C. § 544-Mass. Gen Laws ch. 109A, § 6 vs. Robinson and Smith)

109.    The Trustee repeats and realleges Paragraphs 1 through 108 inclusive, and by reference incorporates them herein and makes them a part of this claim.

109.    Robinson repeats and realleges his responses to paragraphs 1 through 108,

inclusive, as if they were fully set forth in response to paragraph 109.

110.    The Robinson and Smith Payments were made without the Debtor receiving reasonably equivalent value in exchange for said transfers.

110.    Robinson denies that the Robinson and Smith Payments were made without the

Debtor receiving reasonably equivalent value in exchange for said transfers.

111.    At the time of the Robinson and Smith Payments, the Debtor was insolvent or the Debtor became insolvent as a result of said transfers.

111.    Robinson denies that at the time of the Robinson and Smith Payments, the Debtor was insolvent or the Debtor, FKP, became insolvent as a result of said transfers.

112.    If the Robinson and Smith Payments were made for an antecedent debt, Robinson and Smith had reasonable cause to believe that the Debtor was insolvent at the time of the Robinson and Smith Payments.

112.    Robinson denies that if the Robinson and Smith Payments were made for an antecedent debt, Robinson and Smith had reasonable cause to believe that the Debtor was insolvent at the time of the Robinson and Smith Payments.

113.    The Robinson and Smith Payments are avoidable as fraudulent transfers under 11 U.S.C. § 544 and Mass. Gen. Laws ch. 109A, § 6, and pursuant to 11 U.S.C. § 550, the Trustee is entitled to recover from Amadeus the amount of the Robinson and Smith Payments and any further amounts which this court determines to be fraudulently transferred for the benefit of the Debtor's bankruptcy estate.

113.    Robinson denies the averments of paragraph 113.

## COUNT XI
## (Turnover of Property of the Estate Pursuant to 11 U.S.C. § 542(b) – Monies Due under Balfour Note vs. Balfour)

114.    The Trustee repeats and realleges Paragraphs 1 through 113 inclusive, and by reference incorporates them herein and makes them a part of this claim.

114.    Robinson repeats and realleges his responses to paragraphs 1 through 113, inclusive, as if they were fully set forth in response to paragraph 114.

115.    Pursuant to the Balfour Note, Balfour owes a debt in the amount of $50,000 that is property of the Debtor's estate under 11 U.S.C. § 541 that has matured.

115.    Robinson says that Paragraph 115 states a legal conclusion, which does not require a response.  However, to the extent a response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 115.

31

116.    The Debtor's estate is entitled to turnover of monies due under the Balfour Note pursuant to 11 U.S.C. § 542(b).

116.    Robinson says that Paragraph 116 states a legal conclusion, which does not require a response.  However, to the extent a response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 116.

## COUNT XII
### (Turnover of Property of the Estate Pursuant to 11 U.S.C. § 542(b) – Monies Due under Nadal Note vs. Nadal)

117.    The Trustee repeats and realleges Paragraphs 1 through 116 inclusive, and by reference incorporates them herein and makes them a part of this claim.

117.    Robinson repeats and realleges his responses to paragraphs 1 through 116, inclusive, as if they were fully set forth in response to paragraph 117.

118.    Pursuant to the Nadal Note, Nadal owes a debt in the amount of $320,000 that is property of the Debtor's estate under 11 U.S.C. § 541 that is payable on demand.

118.    Robinson says that Paragraph 118 states a legal conclusion, which does not require a response.  However, to the extent a response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 118.

119.    The Debtor's estate is entitled to turnover of monies due under the Nadal Note pursuant to U.S.C. § 542(b).

119.    Robinson says that Paragraph 119 states a legal conclusion, which does not require a response.  However, to the extent a response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 119.

## COUNT XIII
**(Turnover of Property of the Estate Pursuant to 11 U.S.C. § 542(b) – Monies Due under Robinson Notes vs. Robinson)**

120.    The Trustee repeats and realleges Paragraphs 1 through 119 inclusive, and by reference incorporates them herein and makes them a part of this claim.

120.    Robinson repeats and realleges his responses to paragraphs 1 through 119 inclusive, as if they were fully set forth in response to paragraph 120.

121.    Pursuant to the Robinson Note, Robinson owes a debt in the amount of $250,000 that is property of the Debtor's estate under 11 U.S.C. § 541 that has matured.

121.    Robinson denies the averments of paragraph 121.

122.    The Debtor's estate is entitled to turnover of monies due under the Robinson Note pursuant to 11 U.S.C. § 542(b).

122.    Robinson denies the averments of paragraph 122.

## COUNT XIV
**(Turnover of Property of the Estate Pursuant to 11 U.S.C. § 542(b) – Monies Due under Simonetta Note vs. Simonetta)**

123.    The Trustee repeats and realleges Paragraph 1 through 122 inclusive, and by reference incorporates them herein and makes them a part of this claim.

123.    Robinson repeats and realleges his responses to paragraphs 1 through 122 inclusive, as if they were fully set forth in response to paragraph 123.

124.    Pursuant to the Simonetta Note, Simonetta owes a debt in the amount of $150,000 that is property of the Debtor's estate under 11 U.S.C. § 541 that has matured.

124.    Robinson says that Paragraph 124 states a legal conclusion, which does not require a response. However, to the extent a response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 124.

125.    The Debtor's estate is entitled to turnover of monies due under the Simonetta Note pursuant to 11 U.S.C. § 542(b).

125.    Robinson says that Paragraph 125 states a legal conclusion, which does not require a response.  However, to the extent a response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 125.

## COUNT XV
### (Turnover of Property of the Estate Pursuant to 11 U.S.C. § 542(b) – Monies Due under Smith Note vs. Smith)

126.    The Trustee repeats and realleges Paragraphs I through 125 inclusive, and by reference incorporates them herein and makes them a part of this claim.

126.    Robinson repeats and realleges his responses to paragraphs 1 through 125 inclusive, as if they were fully set forth in response to paragraph 126.

127.    Pursuant to the Smith Note, Smith owes a debt in the amount of $62,500 that is property of the Debtor's estate under 11 U.S.C. § 541 that has matured.

127.    Robinson says that Paragraph 127 states a legal conclusion, which does not require a response.  However, to the extent a response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 127.

128.    The Debtor's estate is entitled to turnover of monies due under the Smith Note pursuant to 11 U.S.C. § 542(b).

128.    Robinson says that Paragraph 128 states a legal conclusion, which does not require a response.  However, to the extent a response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 128.

## COUNT XVI
### (Breach of Fiduciary Duty vs. Nadal, Balfour, Swartzman, Maunder, Robinson, Fisher, Horvath, Kassie, Kehler, Loren, Pustil, Volpe, Smith)

34

129.    The Trustee repeats and realleges paragraphs 1 through 128, inclusive, and by reference incorporates them herein and makes them a part of this claim.

129.    Robinson repeats and realleges his responses to paragraphs 1 through 128 inclusive, as if they were fully set forth in response to paragraph 129.

130.    No later than the time of the Amadeus Payments and the Amadeus U.S. Payment, the Debtor became insolvent, as it was unable to pay its debts as they became due and because, fairly valued, the debtor's liabilities exceeded its assets.

130.    Robinson denies that at the time of the Amadeus Payments and the Amadeus U.S. Payment the Debtor, FKP, became insolvent.

131.    Upon the Debtor's insolvency, Nadal, Balfour, Swartzman, Maunder, Robinson, Fisher, Horvath, Kassie, Kehler, Loren, Pustil, Volpe and Smith (the "Debtor's Directors and Officers") had a fiduciary duty to the Debtor's creditors.

131.    Robinson says that the allegation as to any fiduciary duty owed to FKP's creditors states a legal conclusion, which does not require a response.

132.    At all times relevant hereto, the Debtor's Directors and Officers were not disinterested. While simultaneously serving as a FKP director and/or officer, the Debtor's Directors and Officers have strong and specific ties to Amadeus, the majority shareholder, whether as an officer, director, employee, investor, shareholder or consultant. The Debtor's Directors and Officers presided over, participated in, and/or endorsed Amadeus's exercise of active, direct and pervasive control over FKP which was calculated to benefit Amadeus at FKP's expense.

132.    Robinson denies that he and/or the FKP Directors and Officers, other than Nadal, had any material personal interest in transactions and/or payments by and between FKP and Amadeus; and, he denies that allegations contained in the third sentence of paragraph 132. Notwithstanding such denial, Robinson says that Amadeus, as FKP's majority stockholder, exercised legitimate legal control over FKP. Otherwise, Robinson says that Paragraph 132 states legal conclusions, which do not require a response. However, to the extent a response may be required, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the averments of paragraph 132.

35

133.    Debtor's Officers and Directors permitted Amadeus and its U.S. subsidiary, Amadeus U.S., to siphon large amounts of cash from FKP , rendering it insolvent, under the guise of consideration for management services which were not provided or were provided by FKP's officers, directors and/or employees. Moreover, the fees which the Debtor's Officers and Directors caused FKP to pay were patently excessive, above the market rate, and disproportionate to any actual services provided.

133.    Robinson denies that Debtor's, FKP's, Officers and Directors permitted Amadeus and its U.S. subsidiary, Amadeus U.S., to siphon large amounts of cash from FKP rendering it insolvent, under the guise of consideration for management services which were not provided or were provided by FKP's officers, directors and/or employees; and he denies the remaining averments in paragraph 133.

134.    The Debtor's Officers and Directors failed to negotiate, document or memorialize an arms length management fee agreement between the Debtor and Amadeus. The Debtor's Officers and Directors failed to establish any reporting mechanism pursuant to which Amadeus would be held accountable to substantiate the work that was actually performed in exchange for the fees requested. The Debtor's Officers and Directors caused FKP to make an up front exorbitant "advance" of $1,000,000 for so-called management fees to be incurred in the future based upon a non-existent management fee agreement. The Debtor's Officers and Directors failed to require reasonable documentation to support requests for "reimbursement" of expenses by Amadeus.

134.    Robinson denies that the Debtor's, FKP's, Officers and Directors failed to require reasonable documentation to support requests for "reimbursement" of expenses by Amadeus. Otherwise, Robinson says that he lacks sufficient knowledge or information to form a belief as to the truth of the remaining averments of paragraph 134.

135.    By these and other events, the Debtor's Officers and Directors failed to protect the interests of FKP and its creditors, and actively engaged in, and encouraged conduct that injured FKP and it creditors and benefited Amadeus and themselves.

135.    Robinson denies that by these and other events, the Debtor's, FKP's, Officers and Directors failed to protect the interests of FKP and its creditors; and, he denies that they actively engaged in and encouraged, conduct that injured FKP and its creditors and benefited themselves.

Robinson admits that Amadeus benefited by all payments to Amadeus and Amadeus U.S. benefited by all payments to Amadeus U.S.

136.    The Debtor's Officers and Directors are liable for their breach of fiduciary duties to the Debtor and its creditors, including but not limited to, breach of the duties of care, loyalty, independence, and good faith.

136.    Robinson says that Paragraph 136 states a legal conclusion, which does not require a response. However, to the extent a response may be required, Robinson denies the averments of paragraph 136.

137.    By reason of the foregoing, the Debtor's estate has been damaged in an amount to be determined at trial.

137.    Robinson denies that by reason of the averments in Count XVI that the Debtor's, FKP's, estate has been injured. However, Robinson says he is without knowledge or information sufficient to form a belief as to the truth of the remaining averments of paragraph 137.

## COUNT XVII
### (M.G.L. c. 93A vs. Amadeus, Amadeus U.S., Nadal, Balfour, Swartzman, and Maunder)

138.    The Trustee repeats and realleges Paragraphs I through 137, inclusive, and by reference incorporates them herein and makes them a part of this claim.

138.    This Count XVII is directed at defendants other than Robinson; so no response is required.

139.    Amadeus, Amadeus U.S., Nadal, Balfour, Swartzman and Maunder are persons within the meaning of M.G.L. c. 93A §l(a).

139.    This Count XVII is directed at defendants other than Robinson; so no response is required.

140.    Amadeus, Amadeus U.S., Nadal, Balfour, Swartzman and Maunder were engaged in trade or commerce within the meaning of M.G.L. c. 93A. §l(b)

140.    This Count XVII is directed at defendants other than Robinson; so no response is required.

141.    By reason of the foregoing, Amadeus, Amadeus U.S., Nadal, Balfour, Swartzman and Maunder have knowingly and willfully engaged in unfair and deceptive business practices in violation of M.G.L. c. 93A.

141.    This Count XVII is directed at defendants other than Robinson; s so no response is required.

142.    By reason of the foregoing, the Debtor's estate has been damaged in an amount to be established at trial.

142.    This Count XVII is directed at defendants other than Robinson; so no response is required.

## COUNT XVIII
### (Alter Ego Liability/Corporate Veil Piercing)

143.    The Trustee repeats and realleges Paragraphs 1 through 142, inclusive, and by reference incorporates them herein and makes them a part of this claim.

143.    This Count XVIII is directed at defendants other than Robinson; so no response is required.

144.    From FKP's inception through its bankruptcy filing, Amadeus was an insider of FKP. Through its controlling shareholder interest, Amadeus had the power to influence FKP's directors and officers, and to approve or disapprove of any corporate transactions and activity , including but not limited to its executive compensation, its contractual arrangements with Amadeus, and the use of FKP's corporate funds.

144.    This Count XVIII is directed at defendants other than Robinson; so no response is required.

145.    Amadeus, including its representatives on FKP's board of directors and in FKP's management, actively and directly exercised pervasive control over FKP , to the detriment of FKP and its creditors. As an example, Amadeus caused FKP to transfer significant funds to Amadeus and its officers and directors, representing cash assets of FKP under the guise of 'management fees", "executive compensation," and reimbursement for expenses. The fees, compensation and reimbursements were excessive and disproportionate to the alleged services provided by Amadeus. Moreover, Amadeus provided no substantiation for the so-called management fees.

145.    This Count XVIII is directed at defendants other than Robinson; so no response is required.

146.    Because Amadeus exercised control over FKP, it was able to install persons whose loyalty and allegiance was to Amadeus as officers and directors of FKP.

146.    This Count XVIII is directed at defendants other than Robinson; so no response is required.

147.    Amadeus disregarded FKP's separate corporate nature, allocating portions of its overhead and other expenses to FKP in the guise of management fees and excessive and duplicative salaries for executives and directors of FKP who were also executives and directors of Amadeus.

147.    This Count XVIII is directed at defendants other than Robinson; so no response is required.

148.    Upon information and belief, FKP was not adequately capitalized, was not solvent, did not keep corporate records, and did not adhere to corporate formalities, and its officers and directors did not act independently. As a result, its dominant shareholder, Amadeus, was able to siphon off FKP's funds for its benefit and the benefit of its officers and directors. The result was a fraud on and injustice to the Debtor's creditors.

148.    This Count XVIII is directed at defendants other than Robinson; so no response is

required.

149.    As a result, this Court should declare that the separate corporate existence of the Debtor as the subsidiary of Amadeus should be disregarded in law and fact, and that Amadeus is the real party in interest and the alter ego of the Debtor, entitling the Debtor's estate to recover the assets of Amadeus.

149.    This Count XVIII is directed at defendants other than Robinson; so no response is

required.

## II. AFFIRMATIVE DEFENSES

Further answering, Robinson asserts the following affirmative defenses:

### FIRST DEFENSE

The Bankruptcy Court, as a non-Article III Court, lacks jurisdiction to enter judgment on

Count XIII Count XVI in the Complaint, because these state common law claims against

Robinson are non-core proceedings, which do not have a sufficient nexus with the bankruptcy

case to constitute a "related" matter.

### SECOND DEFENSE

The Bankruptcy Court, as a non-Article III Court, lacks jurisdiction over Count XIII and Count XVI in the Complaint, because the unascertained and unliquidated damages, which the Trustee seeks to recover, do not constitute "property" or "assets" of the Debtor's estate.

### THIRD DEFENSE

The Bankruptcy Court, as a non-Article III Court, lacks jurisdiction to finally adjudicate Count XIII and Count XVI in the Complaint, because Robinson does not consent to the entry of final orders or judgment by the Bankruptcy Court.

### FOURTH DEFENSE

The Bankruptcy Court lacks jurisdiction over Count XVI in the Complaint, because the Trustee lacks standing to assert and/or represent the interests of FKP creditors against Robinson; because the Trustee lacks standing to recover money for the benefit of such creditors; and, because Wachovia Bank National Association f/k/a First Union National Bank, rather than the Trustee, is the real party in interest with respect to Count XVI, as it will receive the bulk of any recovery.

### FIFTH DEFENSE

The Bankruptcy Court must abstain from adjudicating Count XVI in the Complaint, alleging a state common law claim in tort against Robinson for breach of fiduciary duty, because the claim could not have been commenced in a United States Court; and, because there is a currently pending civil action, *Wachovia Bank National Association v. First Knowledge Partners, Inc., et al.* (C. A. No. 02-3178), in Massachusetts Suffolk Superior Court, which is based on the same acts, transactions and events as Count XVI and which asserts the same breach of fiduciary duty claim against Robinson.

## SIXTH DEFENSE

Count XVI in the Complaint fails to state any claim upon which relief can be granted against Robinson.

## SEVENTH DEFENSE

Count XVI in the Complaint is barred in whole or in part by the equitable doctrines of waiver, estoppel, laches and/or unclean hands, because, *inter alia*, FKP's financial position *vis a vis* the zone of insolvency, as well as its payment of the alleged management fees, were disclosed to and known by FKP's major creditor, Wachovia Bank National Association f/k/a First Union National Bank at the time of it extending credit to FKP, as well as subsequently thereto; and, despite such knowledge, the Banks, by its acts, transactions and conduct, acquiesced in FKP's payment of the alleged management fees.

## EIGHTH DEFENSE

Count XVI of the Complaint is barred in whole or in part by the doctrine of *in pari delecto,* because, *inter alia*, FKP's major creditor, Wachovia Bank National Association, f/k/a First Union National Bank , knew of FKP's financial condition position *vis a vis* the zone of insolvency, at the time of their extending credit to FKP, and by extending such credit they approved, participated, aided and abetted FKP in pursuing the business plans, transactions and operations, which eventually led FKP into bankruptcy.

## NINTH DEFENSE

Count XVI in the Complaint is barred under the applicable business judgment rule, because Robinson's acts, omissions and decisions were at all times deliberately considered; justifiable by facts, circumstances, information, materials and/or professional opinions upon

which he was entitled to rely; and, undertaken in good faith with the intent of serving the best interests of FKP and FKP creditors.

### TENTH DEFENSE

Count XVI in the Complaint is barred by Delaware's General Corporation Law, Title 8, § 102(b)(7), and the exculpatory protection conferred upon Robinson by FKP's Articles of Organization.

### ELEVENTH DEFENSE

Count XVI in the Complaint alleges damages that are barred by the loss causation rule, because the damages alleged were caused by acts, transactions and events that were unrelated to Robinson's alleged breach of fiduciary duty.

### TWELFTH DEFENSE

Count XVI in the Complaint alleges damages that are barred by the preceding and supervening acts, transactions and conduct of others, including FKP's majority stockholder, Amadeus Capital Corporation; and, FKP's Chairman of the Board, Miles S. Nadal, who negotiated, approved, executed and implemented the alleged management fee arrangement and the payment of management fees to Amadeus Capital Corporation and/or Amadeus U.S. before Robinson became an FKP director, officer and employee.

### THIRTEENTH DEFENSE

Count XVI in the Complaint alleges damages that are barred under the economic loss rule, because the alleged damages do not arise out of any physical injury to FKP's property.

### FOURTEENTH DEFENSE

Count XVI in the Complaint alleges claims for damages, which must be reduced on account of the Trustee's failure to mitigate such damages.

## FIFTEENTH DEFENSE

The Complaint alleges claims for damages, which, pursuant to U.S.C. § 542(b) and/or 11 U.S.C. § 553, as well as other applicable statutory and/or common law, must be reduced by Robinson's equitable recoupment of the fair and reasonable value of the unpaid services he rendered to FKP; his deferred compensation; and, his severance benefits.

## SIXTEENTH DEFENSE

The Complaint alleges claims for damages, which, pursuant to 11 U.S.C. § 542(b) and/or 11 U.S.C. § 553, as well as other applicable statutory and/or common law, must be reduced by Robinson's off-set of the fair and reasonable value of the unpaid services he rendered to FKP; his deferred compensation; and, his severance benefits.

## SEVENTEENTH DEFENSE

Any FKP payments to Robinson within the time period proscribed in applicable preference and fraudulent conveyance laws were transfers made in contemporaneous exchange for new value and were in fact substantially contemporaneous exchanges; so they do not constitute preferential or otherwise avoidable transfers.

## EIGHTEENTH DEFENSE

Any FKP payments to Robinson within the time period proscribed in applicable preference and fraudulent conveyance laws were transfers made in exchange for reasonably equivalent value; so they do not constitute preferential or otherwise avoidable transfers.

## NINETEENTH DEFENSE

Any FKP payments made to Robinson within the time period proscribed in applicable preference and fraudulent conveyance laws were transfers intended by FKP to induce Robinson, a key employee, to continue his employment during the course of FKP's financial turbulence and

to assure him of additional compensation should his services thereafter be terminated without cause; so they do not constitute preferential or otherwise avoidable transfers.

### TWENTIETH DEFENSE

Any FKP payments to Robinson within the time period proscribed in applicable preference and fraudulent conveyance laws were payments made in the ordinary course of FKP's business; so they do not constitute preferential or otherwise avoidable transfers.

### TWENTY FIRST DEFENSE

Any FKP payments to Robinson within the time period proscribed in applicable preference and fraudulent conveyance laws were payments of a debt incurred in the ordinary course of business of the debtor and Robinson, made in the ordinary course of both, according to ordinary business terms; so they do not constitute preferential or otherwise avoidable transfers.

### TWENTY SECOND DEFENSE

The Complaint alleges claims for damages, which would result in the unjust enrichment of FKP and FKP's creditors.

### TWENTY THIRD DEFENSE

After receiving payments from the Debtor, Robinson gave new value to or for the benefit of the Debtor which was not secured by an otherwise unavoidable security interest and on account of which new value the Debtor did not make an otherwise unavoidable transfer to or for the benefit of Robinson. Therefore, any such payments do not constitute preferential or otherwise avoidable transfers.

### TWENTY FOURTH DEFENSE

The Debtor was not insolvent at the times that any of the alleged payments or transfers involving Robinson purportedly were made.

WHEREFORE, Robinson requests that the Trustee's claims against him be dismissed and judgment entered on his behalf; and, that the amount owed Robinson his costs; his attorneys fees; and, such further relief at law or in equity, as this Court deems just and proper.

### III. COUNTERCLAIMS

### COUNT I – (Implied and Express Indemnity)

The defendant, David G. Robinson, hereby asserts his counterclaims for express and implied indemnity against plaintiff, John J. Aquino, Trustee for First Knowledge Partners, Inc.

1.    Counterclaim plaintiff, David G. Robinson ("Robinson"), is a natural person, who resides in the Commonwealth of Massachusetts. During the period January 2000, through at least June 29, 2002, Robinson was duly employed by First Knowledge Partners, Inc. ("FKP"); and, he served at as a Director, President and Chief Executive Officer of FKP at the request of FKP.

2.    Counterclaim defendant , John J. Aquino, is the duly appointed and acting Trustee ("Trustee") of FKP, which, on or about September 16, 2002, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in the Bankruptcy Court for the District of Massachusetts.

3.    FKP is a Delaware Corporation, which was formed in 1999 and later incorporated on or about December 20, 1999. At all times relevant, FKP has maintained its principal place of business in Boston, Massachusetts.

4.    The Trustee acting for and on behalf of FKP, has commenced this Adversary Proceeding against Robinson for various acts, transactions and occurrences, which allegedly constitute wrongful conduct on his part, including, especially, his breach of fiduciary duty to FKP and FKP creditors.

45

5.    At all times relevant, the acts, transactions and occurrences as alleged in Count XVI, if committed by Robinson, were committed in the good faith performance of his duties and responsibilities in a manner he reasonably believed to be in the best interests of FKP.

6.    Robinson has denied that he is liable to Trustee for any alleged wrongful conduct on his part; including any breach of fiduciary duty.

7.    Further, Robinson has asserted that his judgments respecting all such acts, transactions and occurrences are protected by the applicable business judgment rule; and, that the acts, transactions and occurrences alleged in  Count XVI did not involve FKP's expenditure of any of its assets for his own use, benefit and enrichment.

8.    Finally, Robinson has asserted that he did not have any direct, material and/or legally cognizable interests in the acts, transactions and occurrences alleged in Count XVI.

9.    At all time relevant, FKP has had a policy and practice of providing indemnity to its directors, officers and employees for all judgments, as well as the costs and expenses, including reasonable attorneys fees, incurred as a result of the performance of his duties and responsibilities.

10.    At all times relevant, Robinson has performed his duties and responsibilities as a director, officer and employee of FKP in reliance upon the FKP policy and practice of providing such indemnity.

11.    Robinson has fully performed his side of any implied or express agreement on the part of FKP to provide him with indemnity.

12.    Thus, if FKP is unsuccessful in obtaining a judgment against Robinson on Count XVI, then Robinson is entitled to implied and express indemnification for all judgments, as well

46

as the loss, cost and expense, including reasonable attorneys fees, he incurs in defending himself

against each such unsuccessful claim.

WHEREFORE, counter-claim plaintiff, Robinson, demands judgment against the

counterclaim defendant, Trustee, awarding him indemnification with respect to any judgment

entered against him on Count XVI of the Complaint, as well as damages in the amount of any

judgment against him on Count XVI; and, all loss, cost, attorneys fees and expenses which he

incurs defending against Count XVI.

Further, Robinson requests that his claim for indemnity be treated as an administrative

claim with priority over other unsecured claims.

### COUNT II    (Set-Off)

13.    Counterclaim Plaintiff Robinson repeats and realleges Paragraphs 1 through 12 of

this Counterclaim, inclusive, and incorporates them by reference herein and makes them a part of

this claim.

14.    During the pendency of his employment by FKP, Robinson's employment

circumstances sustained a change of control within FKP by virtue of a change in the majority

composition of FKP's Board of Directors, demotion from Robinson's position as CEO, and/or

reduction in his compensation.

15.    The change of control resulted in Robinson's entitlement to certain benefits

awarded under his employment agreement with FKP, which give rise to Robinson's claims

against FKP in the amount of at least $528,282.

16.    Robinson's claims are allowed to be set-off against any claims asserted by the Trustee in this action, and the balance of amounts owing to Robinson should be imposed against FKP.

WHEREFORE, counter-claim plaintiff, Robinson, demands judgment against the counterclaim defendant, Trustee, awarding him damages in the amount of any judgment obtained under this Court II.

Further, Robinson requests that this claim be treated as an administrative claim with priority over other unsecured claims.

### COUNT III – (Breach of Contract)

17.    Counterclaim Plaintiff Robinson repeats and realleges Paragraphs 1 through 16 of this Counterclaim, inclusive, and incorporates them by reference herein and makes them a part of this claim.

18.    During the pendency of his employment by FKP, Robinson's employment circumstances were changed by FKP in a manner adverse to Robinson, resulting in an unwarranted demotion from Robinson's position as CEO, and/or reduction in his compensation.

19.    The changes imposed by FKP constituted breaches of Robinson's employment agreement and resulted in Robinson sustaining damages, which give rise to Robinson's claims against FKP in the amount of at least $528,282.

20.    Robinson's claims are allowed to be set-off against any claims asserted by the Trustee in this action, and the balance of amounts owing to Robinson should be imposed against FKP.

WHEREFORE, counter-claim plaintiff, Robinson, demands judgment against the counterclaim defendant, Trustee, awarding him damages in the amount of any judgment obtained

under this Court III.

Further, Robinson requests that this claim be treated as an administrative claim with priority over other unsecured claims.

## COUNT IV – (Equitable Recoupment)

21.    Counterclaim Plaintiff Robinson repeats and realleges Paragraphs 1 through 20 of this Counterclaim, inclusive, and incorporates them by reference herein and makes them a part of this claim.

22.    During the pendency of his employment by FKP, Robinson provided valuable services to FKP for which he was entitled to be paid, in accordance with the terms and conditions of his employment agreement with FKP.

23.    Robinson's employment circumstances were changed by FKP in a manner adverse to Robinson, resulting in an unwarranted demotion from Robinson's position as CEO, and/or reduction in his compensation. The changes imposed by FKP adversely affected Robinson and resulted in Robinson sustaining damages, which give rise to Robinson's claims against FKP.

24.    In addition, if the Trustee prevails in pursuing claims against Robinson to recover amounts paid to Robinson as compensation pursuant to his employment agreement with FKP, then Robinson would be denied the benefits of his employment with FKP, while having already provided services to FKP.

25.    Robinson is entitled to equitable recoupment of the value of services he provided to FKP for which he was not compensated.

WHEREFORE, counter-claim plaintiff, Robinson, demands judgment against the counterclaim defendant, Trustee, awarding him damages in the amount of any judgment obtained

under this Court IV.

Further, Robinson requests that this claim be treated as an administrative claim with priority over other unsecured claims.

### COUNT V – (Quantum Meruit)

26.    Counterclaim Plaintiff Robinson repeats and realleges Paragraphs 1 through 25 of this Counterclaim, inclusive, and incorporates them by reference herein and makes them a part of this claim.

27.    During the pendency of his employment by FKP, Robinson provided valuable services to FKP for which he was entitled to be paid, in accordance with the terms and conditions of his employment agreement with FKP.

28.    Robinson's employment circumstances were changed by FKP in a manner adverse to Robinson, resulting in an unwarranted demotion from Robinson's position as CEO, and/or reduction in his compensation. The changes imposed by FKP adversely affected Robinson and resulted in Robinson sustaining damages, which give rise to Robinson's claims against FKP.

29.    In addition, if the Trustee prevails in pursuing claims against Robinson to recover amounts paid to Robinson as compensation pursuant to his employment agreement with FKP, the Robinson would be denied the benefits of his employment with FKP, while having already provided services to FKP.

30.    Robinson is entitled to recovery in quantum meruit of the value of services he provided to FKP for which he was not compensated.

WHEREFORE, counter-claim plaintiff, Robinson, demands judgment against the counterclaim defendant, Trustee, awarding him damages in the amount of any judgment obtained

under this Court V.

Further, Robinson requests that this claim be treated as an administrative claim with priority over other unsecured claims.

## IV. CROSS-CLAIMS

### Count I (Contribution)

Defendant, David G. Robinson, hereby asserts this cross-claim for contribution against co-defendants, Amadeus Capital Corporation, Amadeus Capital U.S. Inc., Miles S. Nadal, Robert Balfour, Gavin Swartzman, Trevor Maunder, James D. Fisher, Deszo Horvath, Allan Z. Loren, Stephen M. Pustil, Thomas Volpe, Derek Smith, and Michael Simonetta.

1.    Cross-claim plaintiff, David G. Robinson ("Robinson), is a natural person, who resides in the Commonwealth of Massachusetts. During the period January 2000, through June 29, 2002, Robinson served as a Director, President and Chief Executive Officer of First Knowledge Partners, Inc. ("FKP").

2.    Cross-claim defendant, Amadeus Capital Corporation ("Amadeus"), is, upon information and belief, an Ontario, Canada, corporation with its usual place of business in Toronto, Ontario. Amadeus is the majority stockholder of the Debtor, FKP, owning approximately 70% of its shares.

3.    Cross-claim defendant, Miles S. Nadal ("Nadal"), served as the Chairman of the Board of Directors of FKP for a period of time until at least May 29, 2002.

4.    Cross-claim defendant, Robert Balfour ("Balfour"), served as FKP's Executive Vice President for a period of time until at least May 29, 2002, and was a shareholder of FKP.

5.    Cross-claim defendant, Gavin Swartzman ("Swartzman"), served as FKP's Treasurer, Secretary and Chief Financial Officer for a period of time until at least May 29, 2002.

6.      Cross-claim defendant, Trevor Maunder ("Maunder"), served as FKP's Vice President for a period of time until at least May 29, 2002.

7.      Cross-claim defendant, James D. Fisher ("Fisher"), was Vice Chairman of FKP's Board of Directors for a period of time until at least May 29, 2002. Fisher's usual place of business is not known to Robinson.

8.      Cross-claim defendant, Deszo Horvath ("Horvath"), was a Director of FKP for a period of time until at least November 28, 2001. Horvath' s usual place of business is Ontario, Canada.

9.      Cross-claim defendant, Allan Z. Loren ("Loren "), was a Director of FKP for a period of time until at least December 2001. Loren's usual place of business is Murray Hill, New Jersey.

10.     Cross-claim defendant, Stephen M. Pustil ("Pustil"), was a Director of FKP for a period of time until at least May 29, 2002. Pustil's usual place of business is Ontario, Canada.

11.     Cross-claim defendant, Thomas Volpe ("Volpe"), was a Director of FKP for a period of time until at least May 29, 2002. Volpe's usual place of business is New York, New York.

12.     Cross-claim defendant, Derek Smith ("Smith"), was the Chief Financial Officer of FKP from July 2000 to July 2001. Smith's usual place of business is Massachusetts.

13.     Cross-claim defendant, Michael Simonetta ("Simonetta"), was a shareholder of FKP. Simonetta' s usual place of business is Ontario, Canada.

14.     At all times relevant, the cross-claim defendants owed fiduciary duties to FKP; and, in the event the Court determines that FKP entered the so-called zone of insolvency and/or became insolvent, the cross-claim defendants owed fiduciary duties to FKP's creditors.

15.    On September 16, 2002 ("Petition Date"), FKP commenced this Bankruptcy Case by filing a voluntary petition for relief under Chapter 7 of the Code.  Thereafter, the United States Trustee for the District of Massachusetts appointed John J. Aquino to serve as Trustee ("Trustee") of the Debtor, FKP.

16.    Subsequent to the Petition Date, the Trustee commenced this Adversary Proceeding by filing a Complaint containing Count XVI, alleging that FKP sustained injury and/or damage as a result of Robinson and the counterclaim defendants committing tortuous acts, omissions and transactions, constituting a breach of their fiduciary duty to FKP and its creditors.

17.    The Complaint alleges that at all times relevant Robinson and the cross-claim defendants actively participated in the acts, transactions and events respecting the management fees that are the subject of Count XVI of the Complaint.

18.    Robinson has denied that he is liable for any alleged breach of fiduciary duty; and, he has denied that the alleged breach of fiduciary duty caused any injury and/or damage to FKP.

19.    However, to the extent the Court determines that  FKP incurred any injury and/or damage, as alleged in Count XVI of the Complaint, then on information and belief, such injury and/or damage was caused in whole or in part by the tortuous acts, omissions or transactions of the cross-claim defendants, including without limitation, their breach of fiduciary duty to FKP and/or FKP's creditors.

20.    At all times relevant, the cross-claim defendants' acts and omissions respecting the transactions and occurrences giving rise to Count XVI of the Complaint transpired within the Commonwealth of Massachusetts and/or caused injury and damage within the Commonwealth of Massachusetts.

21.    Therefor, if the Court determines that FKP incurred any injury or loss, as alleged

in  Count XVI; and, if, as a result thereof, Robinson is held liable in this Adversary Proceeding

for any tortuous acts, transactions, or occurrences as alleged in Count XVI of the Complaint,

then Robinson is entitled to judgment against cross-claim defendants for contribution pursuant to

the Massachusetts General Laws, c. 231B; the Delaware Code, Title 10, § 6304(b); and, the

inherent equitable power of the court.

WHEREFORE, cross-claim plaintiff, Robinson, demands judgment against the cross-

claim defendants, Amadeus Capital Corporation, Amadeus Capital U.S. Inc., Miles S. Nadal,

Robert Balfour, Gavin Swartzman, Trevor Maunder, James D. Fisher, Deszo Horvath, Allan Z.

Loren, Stephen M. Pustil, Thomas Volpe, Derek Smith, and Michael Simonetta, awarding him

contribution with respect to any judgment entered against him on Count XVI, as well as any

damages in the amount of any judgment against him on Count XVI of the Complaint.

### Count II (Common Law Indemnification)

Defendant, David G. Robinson, hereby asserts this cross-claim for common law

indemnification against co-defendants, Amadeus Capital Corporation and Miles S. Nadal.

22.    Cross-claim plaintiff, David G. Robinson ("Robinson), is a natural person, who

resides in the Commonwealth of Massachusetts.  During the period January 2000, through June

29, 2002, Robinson served as a Director, President and Chief Executive Officer of First

Knowledge Partners, Inc. ("FKP").

23.    Cross-claim defendant, Amadeus Capital Corporation ("Amadeus"), is, upon

information and belief, an Ontario, Canada, corporation with its usual place of business in

Toronto, Ontario. Amadeus is the majority stockholder of the Debtor, FKP, owning

approximately 70% of its shares.

24.    Cross-claim defendant, Miles S. Nadal ("Nadal"), is, upon information and belief, the controlling shareholder of Amadeus with his usual place of business in Ontario, Canada. Also, Nadal served as the Chairman of the Board of Directors of FKP from its organization at least until May 29, 2002.

25.    At all times relevant, the cross-claim defendants owed fiduciary duties to FKP; and, in the event the Court determines that FKP entered the so-called zone of insolvency and/or became insolvent, the cross-claim defendants owed fiduciary duties to FKP's creditors.

26.    Also, at all times relevant, cross-claim defendants actively participated in and directed the acts, transactions and events respecting the management fees that are the subject of Count XVI of the Complaint.

27.    On September 16, 2002 ("Petition Date"), FKP commenced this Bankruptcy Case by filing a voluntary petition for relief under Chapter 7 of the Code.  Thereafter, the United States Trustee for the District of Massachusetts appointed John J. Aquino to serve as Trustee ("Trustee") of the Debtor, FKP.

28.    Subsequent to the Petition Date, the Trustee commenced this Adversary Proceeding by filing a Complaint containing Count XVI, alleging that FKP sustained injury and/or damage as a result of Robinson and the counterclaim defendants committing tortuous acts, transactions and/or occurrences, constituting a breach of their fiduciary duty to FKP and FKP creditors.

29.    Specifically, the Complaint at paragraph 29 alleges that:

> 29. From its formation in 1999, Amadeus, by means of its controlling interest in FKP, and through FKP's officers and directors who were also employees, officers, directors, and/or owners of Amadeus, and/or whose allegiances were to Amadeus and not FKP, caused FKP to transfer significant cash amounts to it and/or its U.S. subsidiary, Amadeus U.S., under the pretext that

such transfers were in consideration for 'management and consulting' fees or for the payment of 'operating costs' or 'reimbursement of expenses.'

30.    Further, the Complaint at paragraphs 43, 44 and 45 alleges that:

43.  Upon information and belief, in consideration for the Amadeus Payments and the Amadeus U.S. Payment, little or no "management services" were performed by Amadeus or its U.S. subsidiary as a distinct and separate entity as opposed to services performed by officers, directors, and/or employees of Amadeus who were also officers, directors and/or employees of the Debtor. The fees were excessive, not based on an arms length negotiation or market value, and disproportionate to any such services which were provided.

44.  Upon information and belief, no independent evaluation or determination was made by the officers and directors of the Debtor to determine whether the Amadeus Payments and the Amadeus U.S. Payment were in consideration for actual services or expenses independently incurred by Amadeus on behalf of the Debtor, whether the services or expenses, to the extent that they were performed or incurred, were necessary for the business operations of the Debtor, or that the fees and expenses charged represent the fair market value price that would be charged by a similar firm in the industry.

45.  No written agreement exists between the parties which sets forth the terms and conditions under which Amadeus is to perform management services, including the fees for such services.  To the extent that the Amadeus Payments and Amadeus U.S. Payment were made allegedly for the reimbursement of expenses, no supporting documentation was provided to the Debtor evidencing such expenses.

31.    Finally, the Complaint at paragraphs 133 and 134 alleges that:

133.  Debtor's Officers and Directors permitted Amadeus and its U.S. subsidiary, Amadeus U.S., to siphon large amounts of cash from FKP rendering it insolvent, under the guise of consideration for management services which were not provided or were provided by FKP's officers, directors and/or employees. Moreover, the fees which the Debtor's Officers and Directors caused FKP to pay were patently excessive, above the market rate and disproportionate to any actual services provided.

> 134. The Debtor's Officers and Directors failed to negotiate, document or memorialize an arms length management fee agreement between the Debtor and Amadeus. The Debtor's Officers and Directors failed to establish any reporting mechanism pursuant to which Amadeus would be held accountable to substantiate the work that was actually performed in exchange for the fees requested. The Debtor's Officers and Directors caused FKP to make an up front exorbitant "advance" of $1,000,000 for so-called management fees to be incurred in the future based upon a non-existent management fee agreement. The Debtor's Officers and Directors failed to require reasonable documentation to support requests for "reimbursement" of expenses by Amadeus.

32.    Robinson has denied that he is liable for any alleged breach of fiduciary duty; and, he has denied that the alleged breach of fiduciary duty caused any injury and/or damage to FKP.

33.    Before Robinson became a Director, Officer and employee of FKP, Amadeus and CIBC Capital Corporation (CIBCCC), FKP's two shareholders, made an arrangement pursuant to which Amadeus would provide Nadal's personal investment, transactional and managerial services to FKP for an annual management fee of $1 million.

34.    At the direction of Amadeus and Nadal, FKP paid the agreed upon management fees to Amadeus for Nadal's personal services.

35.    The foregoing alleged active, intentional, direct, primary and predominant wrongful acts, transactions and events committed by Amadeus and Nadal, if proven at trial, unjustly exposed Robinson to liability to FKP and/or FKP creditors.

36.    In comparison to such alleged active, intentional, direct, primary and predominant wrongful conduct, Robinson's role respecting the management fees was at all times relevant, secondary, insignificant and passive.

37.    Moreover, Amadeus and/or Nadal received the allegedly excessive management fees and thereby they profited and/or otherwise benefited by FKP's payment of the management fees.

38.    Robinson did not receive the management fees, nor did he profit and/or otherwise benefit by FKP's payment of the management fees.

39.    Thus, the Trustee's recovery of the management fees paid to Amadeus and/or Nadal from Robinson, while permitting Amadeus and/or Nadal to keep and retain such management fees for their own profit and benefit, would be unjust, unfair and inequitable with respect to Robinson.

40.    Therefore, if the Court determines that FKP incurred any injury and/or damage, as alleged in Count XVI; and, if as a result thereof, Robinson is held liable in this Adversary Proceeding for any of the management fees paid to Amadeus and/or Nadal, then Robinson is entitled to judgment against cross-claim defendants for common law indemnification.

WHEREFORE, cross-claim plaintiff, Robinson, demands judgment against cross-claim defendants, Amadeus and Nadal, awarding him indemnification with respect to any judgment entered against him on Count XVI, as well as damages in the amount of any judgment against him on Count XVI; and, all loss, cost, attorneys fees and expenses which he incurs defending against Count XVI.

### Count III (Unjust Enrichment)

Defendant, David G. Robinson, hereby asserts this cross-claim for unjust enrichment against co-defendants, Amadeus Capital Corporation and Miles S. Nadal.

41.    Cross-claim plaintiff, David G. Robinson ("Robinson), is a natural person, who resides in the Commonwealth of Massachusetts. During the period January 2000, through June 29, 2002, Robinson served as a Director, President and Chief Executive Officer of First Knowledge Partners, Inc. ("FKP").

42.    Cross-claim defendant, Amadeus Capital Corporation ("Amadeus"), is, upon information and belief, an Ontario, Canada, corporation with its usual place of business in Toronto, Ontario. Amadeus is the majority stockholder of the Debtor, FKP, owning approximately 70% of its shares.

43.    Cross-claim defendant, Amadeus U.S., is, upon information and belief, a Delaware corporation, with its usual place of business in New York, New York. Amadeus U.S. is a wholly owned subsidiary of Amadeus.

44.    Cross-claim defendant, Miles S. Nadal ("Nadal"), is, upon information and belief, the controlling shareholder of Amadeus with his usual place of business in Ontario, Canada. Also, Nadal served as the Chairman of the Board of Directors of FKP from its organization at least until May 29, 2002.

45.    On September 16, 2002 ("Petition Date"), FKP commenced this Bankruptcy Case by filing a voluntary petition for relief under Chapter 7 of the Code. Thereafter, the United States Trustee for the District of Massachusetts appointed John J. Aquino to serve as Trustee ("Trustee") of the Debtor, FKP.

46.    Subsequent to the Petition Date, the Trustee commenced this Adversary Proceeding by filing a Complaint containing Count XVI, alleging that FKP sustained injury and/or damage as a result of Robinson and the counterclaim defendants committing tortuous acts,

59

transactions and/or occurrences, constituting a breach of their fiduciary duty to FKP and FKP

creditors.

47.     Specifically, the Complaint at paragraph 29 alleges that:

29.  From its formation in 1999, Amadeus, by means of its
controlling interest in FKP, and through FKP's officers and
directors who were also employees, officers, directors, and/or
owners of Amadeus, and/or whose allegiances were to Amadeus
and not FKP, caused FKP to transfer significant cash amounts to it
and/or its U.S. subsidiary, Amadeus U.S., under the pretext that
such transfers were in consideration for 'management and
consulting' fees or for the payment of 'operating costs' or
'reimbursement of expenses.'

48.     Further, the Complaint at paragraphs 43, 44 and 45 alleges that:

43.  Upon information and belief, in consideration for the Amadeus
Payments and the Amadeus U.S. Payment, little or no
"management services" were performed by Amadeus or its U.S.
subsidiary as a distinct and separate entity as opposed to services
performed by officers, directors, and/or employees of Amadeus
who were also officers, directors and/or employees of the Debtor.
The fees were excessive, not based on an arms length negotiation
or market value, and disproportionate to any such services which
were provided.

44.  Upon information and belief, no independent evaluation or
determination was made by the officers and directors of the Debtor
to determine whether the Amadeus Payments and the Amadeus
U.S. Payment were in consideration for actual services or expenses
independently incurred by Amadeus on behalf of the Debtor,
whether the services or expenses, to the extent that they were
performed or incurred, were necessary for the business operations
of the Debtor, or that the fees and expenses charged represent the
fair market value price that would be charged by a similar firm in
the industry.

45.  No written agreement exists between the parties which sets
forth the terms and conditions under which Amadeus is to perform
management services, including the fees for such services.  To the
extent that the Amadeus Payments and Amadeus U.S. Payment
were made allegedly for the reimbursement of expenses, no
supporting documentation was provided to the Debtor evidencing
such expenses.

60

49.    Finally, the Complaint at paragraphs 133 and 134 alleges that:

> 133.  Debtor's Officers and Directors permitted Amadeus and its
> U.S. subsidiary, Amadeus U.S., to siphon large amounts of cash
> from FKP rendering it insolvent, under the guise of consideration
> for management services which were not provided or were
> provided by FKP's officers, directors and/or employees.
> Moreover, the fees which the Debtor's Officers and Directors
> caused FKP to pay were patently excessive, above the market rate
> and disproportionate to any actual services provided.

> 134.  The Debtor's Officers and Directors failed to negotiate,
> document or memorialize an arms length management fee
> agreement between the Debtor and Amadeus.  The Debtor's
> Officers and Directors failed to establish any reporting mechanism
> pursuant to which Amadeus would be held accountable to
> substantiate the work that was actually performed in exchange for
> the fees requested.  The Debtor's Officers and Directors caused
> FKP to make an up front exorbitant "advance" of $1,000,000 for
> so-called management fees to be incurred in the future based upon
> a non-existent management fee agreement.  The Debtor's Officers
> and Directors failed to require reasonable documentation to
> support requests for "reimbursement" of expenses by Amadeus.

50.    Robinson has denied that he is liable for any alleged breach of fiduciary duty;

and, he has denied that the alleged breach of fiduciary duty caused any injury and/or damage to

FKP.

51.    Before Robinson became a Director, Officer and employee of FKP, Amadeus and

CIBC Capital Corporation (CIBCCC), FKP's two shareholders, made an arrangement pursuant

to which Amadeus would provide Nadal's personal investment, transactional and managerial

services to FKP for an annual management fee of $1 million.

52.    At the direction of Amadeus and Nadal, FKP paid the agreed upon management

fees to Amadeus and/or Amadeus U.S. for Nadal's personal services.

53.    Further, Amadeus, Amadeus U.S. and/or Nadal received the allegedly excessive management fees and thereby they profited and/or otherwise benefited by FKP's payment of the management fees.

54.    Robinson did not receive the management fees, nor did he profit and/or otherwise benefit by FKP's payment of the management fees.

55.    Thus, the Trustee's recovery of the management fees paid to Amadeus, Amadeus U.S. and/or Nadal from Robinson, while permitting Amadeus, Amadeus U.S. and/or Nadal to keep and retain such management fees for their own profit and benefit, would unjustly enrich Amadeus, Amadeus U.S. and/or Nadal.

56.    Therefore, if the Court determines that FKP incurred any injury and/or damage, as alleged in Count XVI; and, if as a result thereof, Robinson is held liable in this Adversary Proceeding for any of the management fees paid to Amadeus, Amadeus U.S. and/or Nadal, then Robinson is entitled to judgment against cross-claim defendants for unjust enrichment.

WHEREFORE, cross-claim plaintiff, Robinson, demands judgment against cross-claim defendants, Amadeus, Amadeus U.S. and/or Nadal, awarding him damages in the amount of any judgment against him on Count XVI; and, all loss, cost, attorneys fees and expenses, which he incurs defending against Count XVI.

## V.  OBJECTION TO BANKRUPTCY COURT JURISDICTION

Defendant, David G. Robinson, hereby objects to the Bankruptcy Court's "related to" jurisdiction over its issuing final orders and/or any judgment on Count XVI in the Complaint.

## VI.  DEMAND FOR JURY TRIAL

Defendant, counterclaim plaintiff and cross-claim plaintiff, David G. Robinson, demands

a trial by jury on all issues arising in the Complaint, as well as his counterclaims and his cross-

claims, that are triable to a jury.

> Respectfully submitted
> for the defendant,
> David G. Robinson
> by his attorney:
>
>
> Theodore E. Dinsmoor (BBO #125540)
> William V. Sopp (BBO #544625)
> Burns & Levinson LLP
> 125 Summer St.
> Boston, MA  02110
> (617) 345-3000
> (617) 345-3299 facsimile

Dated:  December 15, 2004

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>FIRST KNOWLEDGE PARTNERS, INC.<br><br>         Debtor. | Chapter 7<br>Case No. 02-16649 CJK |

In re: )
FIRST KNOWLEDGE PARTNERS, INC. )  Chapter 7
)  Case No. 02-16649 CJK
Debtor. )

JOHN J. AQUINO, TRUSTEE, )
)
Plaintiff, )
)
v. )
)
AMADEUS CAPITAL CORPORATION, )
AMADEUS CAPITAL U.S. INC., )
MILES S. NADAL, ROBERT BALFOUR, )
GAVIN SWARTZMAN, TREVOR )  Adversary Proceeding
MAUNDER, DAVID G. ROBINSON, )  No. 04-01288-JNF
JAMES D. FISHER, DESZO HORVATH, )
DAVID C. KASSIE, DEAN C. KEHLER, )
ALLAN Z. LOREN, STEPHEN M. PUSTIL, )  Civil Action
THOMAS VOLPE, DEREK SMITH )  No. 05-cv-10529-FDS
and MICHAEL SIMONETTA, )
)
Defendants. )

## LOCAL RULE 7.1(A)(2) CERTIFICATE

Pursuant to Local Rule 7.1((A)(2) for the United States District court for the District of

Massachusetts, I, Theodore E. Dinsmoor, hereby certify that prior to filing defendant Robinson's

Motion for Leave to File A Reply Memorandum to Trustee's Opposition to his Motion for

Withdrawal, I attempted to confer with Trustee's counsel in a good faith attempt to resolve or narrow the issues raised thereby.

> Respectfully submitted
> for the defendant,
> David G. Robinson
> by his attorney:
>
>
> Theodore E. Dinsmoor (BBO #125540)
> Burns & Levinson LLP
> 125 Summer St.
> Boston, MA  02110
> (617) 345-3000
> (617) 345-3299 facsimile

Dated: April 7, 2005